# DENO CONSTANTINE KANARAS v. STATE OF MARYLAND

[No. 1210, September Term, 1982.]

*Decided May 6, 1983.*

The cause was argued before WILNER, ALPERT and BLOOM, JJ.

*Joseph F. Murphy, Jr.,* with whom were *White & Murphy* on the brief, for appellant.

*Stephanie J. Lane, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Joseph I. Cassilly, State's Attorney for Harford County,* and *Gerard S. Comen, Assistant State's Attorney for Harford County,* on the brief, for appellee.

ALPERT, J., delivered the opinion of the Court.

In this case we hold that no error was committed by the Circuit Court for Kent County (Rasin, J.) in the trial of Deno Constantine Kanaras, the appellant, and we shall affirm the judgment of that court. Appellant was indicted by the grand jury for Harford County on July 28, 1981 for murder, daytime housebreaking and theft offenses. At trial, Kanaras did not deny his presence at the scene of the crimes while they were being committed, but rather his defense was that

any involvement on his part was coerced by one John Huffington, who had already been tried and convicted of first degree premeditated murder.[1] The case was removed to Kent County and after a nine-day jury trial, appellant was convicted of felony murder, theft and daytime housebreaking. Judge Rasin imposed a life sentence for the convictions. An appeal was timely filed, and appellant contends that:

1. He was denied a fair trial by the State's deliberate non-disclosure of (a) inconsistent statements given by a prosecution witness it intended to call, in violation of a pretrial discovery order, and (b) statements prepared by the chief investigator concerning matters he testified to on direct examination;
2. The trial court erred in denying appellant's motions for judgment of acquittal on the felony murder and daytime housebreaking charges;
3. The trial court erred in prohibiting appellant's psychiatrist from expressing opinions about whether appellant's psychological profile was consistent or inconsistent with voluntary participation in a violent crime and with prompt reporting to the authorities;
4. The trial court erred in varying the order of proof on its own motion so as to permit evidence of appellant's other crimes in order for the jury to assess appellant's credibility; and
5. The trial court erred in permitting the State to introduce motivation evidence against appellant.

## I. *The Becker and Hudson Murders*

In the early morning hours of May 25, 1981 Diane Becker ("Becker") and Joseph Hudson ("Hudson") were brutally

---

1. Huffington's conviction was recently overturned on appeal by the Court of Appeals and his case remanded for a new trial. *See,* Huffington v. State, 295 Md. 1, 452 A.2d 1211 (1982).

murdered in Harford County, Maryland. There is little doubt that the murders were drug-related. On the night in question Deno Constantine Kanaras ("Kanaras") and John Norman Huffington ("Huffington") were seeking to obtain cocaine. Kanaras telephoned Huffington, who after attempting unsuccessfully to locate a seller, told the appellant to pick him up in order that the two might consummate a deal elsewhere. About midnight the two went to Pecora's Fallston Inn. After about forty-five minutes, they left for the Golden Forty, another drinking establishment, arriving there at about 1:20 A.M. At the Golden Forty Huffington spoke with Joseph Hudson about the possible purchase of cocaine. Shortly thereafter, Hudson and Diane Becker, his girlfriend, left the club with another couple. Appellant and Huffington followed the others to a local convenience store where Huffington and Hudson made the necessary arrangements for the cocaine deal. Appellant and Huffington continued to follow Hudson and Becker to the campgrounds, where the victims maintained a 22-foot Shasta recreational vehicle,[2] and then returned to Huffington's apartment. A deal with a third party was supposedly arranged and Hudson, believing that the third party wished to speak with him directly, accompanied appellant and Huffington to a location off Route 24 in Harford County. After they exited appellant's car, Hudson was shot several times by Huffington and cocaine was taken from his person. Huffington and Kanaras left Hudson for dead.

At this point, according to Kanaras, Huffington pointed the gun at him and ordered him to return to the campgrounds, for the supposed purpose of removing about $2,000.00, which Huffington had been told was for drug transactions, from the Hudson trailer. Upon their arrival at the mini-motor home, they found Diane Becker and her child asleep. Kanaras found the money to which Huffington had

---

2. See Part III, *infra.*

alluded. Huffington took the money. Next, Huffington proceeded to hit Becker across the head with a large bottle five or six times and then stabbed her in the chest and throat until she was dead. The two returned to Huffington's apartment where the money was divided and bloodstained clothes washed. Later they disposed of the bottle, some bullets, and burned other evidence of the crimes.

It was about 1:00 P.M. when Kanaras finally arrived back at his house. He slept until about 6:00 P.M. whereupon he discovered that the authorities wished to speak with him. Huffington had telephoned Kanaras, warning him not to tell the police what had happened or else "he would get me." The following day, appellant, along with his father and his attorney, went to speak with the State's Attorney. Kanaras voluntarily gave a statement and participated in the recovery of the evidence which Huffington had sought to destroy.

On June 16, 1981 Kanaras testified before the Harford County Grand Jury. As a result of this testimony, Huffington was indicted. On July 28, 1981 Kanaras was himself indicted for the murders and for unrelated narcotics offenses. Kanaras testified against Huffington at Huffington's trial on November 9, 1981. The case against Kanaras was removed to Kent County on January 20, 1982. A jury there found the appellant guilty of the felony murder of Diane Becker, theft and daytime housebreaking.

II. *Production of Statements of Rassa and Saneman*

A. *The Rassa Statements*

At a pretrial motions hearing, it was ordered "that the State furnish to the defendant . . . copies of any inconsistent statements of witnesses it intends to call, if such statements exist and are in its possession. . . ." At a pretrial conference, defense counsel sought to prohibit "evidence proof that Kanaras committed other crimes on other occasions, such as drug transactions or theft offenses, or weapons offenses." The prosecutor replied that "at this particular time we have no intention whatsoever of using any of that information at all during the course of the trial in chief." During the course

of the trial, the prosecution proffered that Stephen Rassa would testify that on a prior occasion, just before he and the appellant purchased cocaine from Hudson and Becker at the camper, Kanaras stated that he "wouldn't mind robbing Joe Hudson and stealing his coke and money," and that on that occasion the appellant had to be dissuaded from carrying a gun into the camper during the cocaine purchase. Appellant contends that under the pretrial order he should have received prior statements by this witness before he testified. This contention is without merit.

No sanctions were ever sought for the alleged violation of the pretrial discovery order. Further, the conditions suggested in that order were not required under the Maryland Rules. Appellant may not present the claim for the first time on appeal. Maryland Rule 1085. The failure to seek sanctions operates as a waiver of any defects and prohibits appellate review of the question. Further, even if the issue were properly before us we would find the contention to be without merit. Appellant received the statements at the precise time that he was entitled to receive them, *i.e.,* after Rassa's direct examination. *See, Leonard v. State,* 46 Md. App. 631, 421 A.2d 85 (1980), *affirmed,* 290 Md. 295, 429 A.2d 538 (1981) and the discussion of disclosure of Saneman's notes, *infra.*

B. *Saneman's Notes (Production for Purpose of Impeachment)*

David Saneman, a deputy in the Harford County Sheriff's Office, served as chief investigator of the Hudson and Becker murders. Saneman testified that in the evening after the murders he went to the appellant's house and was told by the appellant that while he had been with Huffington on the night in question, he was unaware of the killings. With appellant's consent, Saneman had appellant's car searched. The next morning appellant voluntarily appeared at the State's Attorney's Office, where in the presence of his attorney and Saneman, a statement implicating Huffington was given. Kanaras maintained, however, that he was not a vol-

untary participant in the crimes. With the help of the appellant, Saneman was able to recover the handgun and knife used in the murders, ammunition, and Becker's burnt purse and identification. It was through Saneman's testimony that Kanaras' detailed statement was introduced at trial.

Saneman did not use any notes during his direct examination. However, prior to cross-examining the witness, defense counsel sought to obtain statements Saneman had written concerning his investigation and reports he had prepared concerning the matters to which he had testified. The production of these writings was refused by the trial judge on the basis that the witness was a police investigator and that the writings were of an investigatory nature. Assuming arguendo that the trial judge erred in refusing to order the State to produce the subject reports, under the unique circumstances of this case, any error therein was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976).

Appellant contends that he "was denied a fair trial by the State's deliberate non-disclosure of . . . statement prepared by the chief investigator [Saneman] concerning matters he testified to on direct examination." However, in his argument he speculates that there was something in Saneman's notes "that the defense could make use of," thus implying a desire to impeach Saneman by use of those notes — a tactic which seems to be inconsistent with the defense presented at trial.

The defense theory at trial had been that Kanaras was an unwilling participant in the criminal activities and was "coerced" by Huffington into committing the offenses. It was argued that Kanaras participated only out of a fear of Huffington and that he cooperated fully with the authorities. The importance in this consideration will become apparent.

Maryland Rule 741 governs discovery in criminal proceedings. In relevant part, it requires the State to produce any material or information which tends to negate the guilt

of defendant or a co-defendant. In both state and federal courts case law has emerged as a result of the decision of the United States Supreme Court in the case of *Jencks v. United States,* 353 U.S. 657 (1957) thrusting an additional duty of production upon prosecutors (separate and apart from pre-trial discovery). After a witness has testified for the prosecution, if it is disclosed that the witness has previously made oral or written reports or statements concerning the matters to which he has testified, upon request by defense counsel, those writings or reports must be produced. *Id.* The purpose of requiring production of these statements [3] is to allow defense counsel the opportunity to discover any inconsistencies between the witness' trial testimony and his prior statements. Armed with these inconsistencies, defense counsel would be better able to impeach the credibility of the witness' trial testimony. This method of impeachment by prior inconsistent statement is an effective and often used method of cross-examination which brings into question the believability of a witness' testimony. *See generally,* McCormick on Evidence §§ 34-38 (2d ed. 1972).

No foundation of inconsistency need be laid by defense counsel before production of the writings is required. *Jencks, supra.* For production purposes it need only appear that the evidence is relevant, competent, and outside of any exclusionary rule. *Id.* As a result of the decision of the Supreme Court in *Jencks,* Congress moved swiftly to enact 18 U.S.C. § 3500 in 1957, the act popularly known as the Jencks Act. One of the most important motivating forces behind its enactment was the fear that an expansive reading of the Supreme Court's opinion in *Jencks* would compel indiscriminate production of agents' summaries of interviews regardless of their character or completeness. *See, Palermo v. United States,* 360 U.S. 343 (1959). In pertinent part, the Jencks Act provides:

---

**3.** See Whitehead v. State, 54 Md. App. 428, 458 A.2d 905 (1983) wherein we held that the defendant was not entitled to inspect notes made by three different police officers and by an assistant state's attorney during pretrial interviews of a State's witness, because they were not shown to be "statements" for *Jencks* purposes.

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena (sic), discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statment relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

\* \* \*

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means —

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500.

The decision in *Jencks* was not constitutionally based but involved in supervisory jurisdiction of the Supreme Court over the federal courts. *Palermo, supra,* 360 U.S. at 350. While the federal act is not binding on the individual states, Maryland courts have, in the absence of legislative enactment, implicitly accepted the underlying foundations of the law without adopting wholesale the rules contained therein, primarily on the basis of due process consideration, and as a necessary outgrowth of the right of cross-examination. *Carr v. State,* 284 Md. 455, 472-73, 397 A.2d 606 (1979); *Leonard v. State, supra.* In this regard, our opinion in *Leonard* is most instructive.

During the cross-examination of the victim in *Leonard,* a prosecution for armed robbery, it was revealed that on the night after the alleged robbery, that witness had given a written statement to the police. Defense counsel sought to obtain a copy of the statement, but the trial court, after examining the statement, found no exculpatory material contained therein and denied defense counsel's request for production. We reversed, holding that the trial judge had applied both an incorrect standard and an incorrect procedure in reaching its conclusion. Judge Wilner, speaking for this Court, observed:

> *Carr* makes clear beyond question that a defendant's right, at trial, to inspect the prior statement of a state's witness who has testified is not necessarily limited (1) by the rules pertaining to pretrial discovery, or (2) to statements that are merely exculpatory. When confronted with the actual testimony of a critical witness and the knowledge that the witness has given a prior statement bearing on a material issue in the case, counsel is not engaged in a mere "fishing expedition" in seeking access to the prior statement. At that point, it becomes more than a matter of casting a seine over the State's files to see what turns up, but of directly confronting the witness ... *The test clearly is whether the statement is, or may be, inconsistent with the wit-*

*ness' trial testimony, and thus usable in cross-examination.* To the extent that the court judged, or appeared to judge the issue exclusively in terms of whether the statement was exculpatory, it was plainly in error. (emphasis supplied).

46 Md. App. at 637-38, 421 A.2d at 88-89.

Citing a passage from *Jencks, supra,* cited in *Carr, supra,* 284 Md. at 461, 397 A.2d at 608, that "[F]lat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency," Judge Wilner went on in *Leonard* to observe:

These more subtle aspects of potential inconsistency, intrinsically subjective, have to be viewed from the defendant's perspective, and can be properly weighed only by defense counsel (with the assistance of his client). A screening of the statement by the court cannot suffice as an effective substitute. The court cannot be expected to view in the same context as defense counsel these more latent and subtle gaps or differences; nor should it purport to do so . . . [I]t is incumbent upon the court, under the circumstances evident here, to permit counsel to inspect the statement and determine for himself whether it is or is not usable for cross examination. The court still retains, of course, the ultimate right to determine whether the statement, or any part of it, is admissible in evidence, either as a document or through questions propounded to the witness. *The issue here is not admissibility but inspection for possible use in cross examination.* (emphasis supplied).

46 Md. App. at 638-39, 421 A.2d at 89.

The principles of *Carr* and *Leonard* have recently been held to apply to witness statements in administrative proceedings under the Law Enforcement Officers' Bill of Rights. *Chief, Montgomery County Dept. of Police v. Jacocks,* 50 Md.

App. 132, 436 A.2d 930 (1981). *See, Whitehead v. State,* 54 Md. App. 428, 458 A.2d 905 (1983).

Citing *Carr* and *Leonard,* appellant contends that the trial judge abused his discretion in denying the blanket disclosure of the extensive report prepared by Saneman. Ordinarily, we might agree with appellant, but given the unique circumstances and present posture of this case, application of the Carr-Leonard principles is unnecessary. As previously stated, Kanaras defended the action on the basis that he was an unwilling participant in the crimes, he was coerced by Huffington and that he assisted the authorities in solving the crimes and prosecuting the perpetrator. With that point in mind, a review of Saneman's testimony makes clear that appellant was not in any way harmed or prejudiced by the testimony. Saneman said what Kanaras would have hoped he would say about appellant's participation in the events. He indicated that Kanaras had voluntarily come forward, implicated Huffington, led the authorities to evidence that might not have been found without his assistance, testified against Huffington, and generally cooperated with the investigating and prosecuting authorities. There were no critical omissions between Saneman's testimony and Kanaras' statement. Under these circumstances, Kanaras would not want to impeach the testimony of Saneman, for to do so would cast doubt in the minds of the jury as to the validity and viability of the defense he was presenting. In the language of *Jencks,* this material would not be relevant, for Kanaras would not want to impeach Saneman's testimony. It appears that defense counsel was merely trying to use the "back door" to obtain broad investigatory evidence that was otherwise undiscoverable. *Carr* and *Leonard* are not the proper vehicles for the production of such evidence. Discovery of so-called *"Brady"* exculpatory material is provided for under Maryland Rule 741 and for its required production we depend upon prosecutorial integrity. Appellant has apparently misconstrued the purposes of *Carr* and *Leonard.* Furthermore, a review of the testimony given by Kanaras indicates nothing that contradicts Saneman's testi-

mony, thus lending further credence to the notion that it was in Kanaras' best interests not to impeach Saneman's testimony. Under these circumstances, the denial by the trial judge of defense counsel's request for production of the writings of Saneman was not reversible error. We reiterate that we do not decide the issue based upon the distinction drawn by the trial judge that the writings sought to be produced were police investigatory reports.

Police reports may or may not provide "statements" under *Carr* and *Leonard.* To the extent that they do, there exists no sanctuary by virtue of the uniform or the badge. For a compilation of those cases addressing the issue of whether a statement or report of a police or investigatory officer made in connection with his investigation of the case and his arrest of the defendant was producible for impeaching the police officer, *see,* 7 A.L.R. 3d 181 "Discovery — Impeachment of Witness" § 10(f).

III. *Denial of the Motion for Judgment of Acquittal (The Shasta as a Dwelling House)*

Appellant next contends that "the daytime housebreaking and felony murder charges should never have been submitted to the jury because Hudson's recreation vehicle [in which Becker was murdered] is not a *house* within the meaning of Code, Art. 27, Sec. 30(b)." It is argued that the victims' 22 foot Shasta was a vehicle and not a mobile home. He points out that the Shasta was self-propelled, readily movable, resting on wheels, registered with the State Motor Vehicle Administration and had been at the campground for less than a month. Further, we are referred to the fact that Becker had an apartment in Edgewood, Maryland, and that Hudson's official address was listed as Aberdeen, Maryland. We find this contention to be without merit.

Md. Ann. Code art. 27, § 30 (b) [4] provides that:

---

4. Subsection (a) of Article 27, § 30 creates the offense of statutory burglary. Its material difference from the daytime housebreaking provision lies in the designation of the time of day of the two offenses. Decisions interpreting "dwelling house" under the burglary law are fully applicable in our analysis of what constitutes a dwelling house under the daytime housebreaking statute.

> Any person, his aiders, abettors and counsellors, who shall be convicted of the crime of breaking a dwelling house in the daytime with intent to commit a murder or felony therein, or with intent to steal, take or carry away the personal goods of another of any value therefrom, shall be guilty of a felony, and upon conviction thereof, shall be sentenced to the penitentiary for not more than ten years. (emphasis supplied).

The statute must be construed in light of the common law, *Reagan v. State,* 2 Md. App. 262, 234 A.2d 278 (1967), and as such, in order to determine whether the vehicle in question was a dwelling house, we must examine the purpose at common law of imposing punishment for the parallel crime of burglary.

This court has in the past observed that the law of burglary was developed for the purpose of protecting the habitation of an individual. *See, Arnold v. State,* 7 Md. App. 1, 252 A.2d 878 (1969). An annotation in 43 A.L.R.2d at pp. 834-35 explicates this notion:

> It is evident that the offense of burglary at common law was considered one aimed at the security of the habitation rather than against property. That is to say, it was the circumstance of midnight terror aimed toward a man or his family who were in rightful repose in the sanctuary of the home, that was punished, and not the fact that the intended felony was successful. Such attempted immunity extended to a man's dwelling or mansion house has been said to be attributable to the early common-law principle that a man's house is his castle. The jealousy with which the law guarded against any infringement of this ancient right of peaceful habitation is best illustrated by the severe penalties which at common law were assessed against a person convicted of burglary, even though the enterprise, except for the essential elements of

breaking and entering a mansion house or dwelling house at night with intent to commit a felony therein, was unsuccessful. (footnotes omitted).

Further, as one text writer has observed:

That every man's house is "his castle" is a concept that has been echoed down through the ages and the social interest in the security of the "castle" has its origin in antiquity; for just as an animal or a bird resents any intrusion into its place of abode, so no doubt did primitive man. The terms commonly used to indicate the place are "dwelling" or "dwelling house," but the "word 'dwelling' imports a human habitation," and as a matter of common law, burglary is strictly an offense against the habitation ... *A regular place of abode is a "dwelling house" for purposes of burglary, moreover, even if it is on wheels and not restricted to a particular locality. "A house trailer is simply a mobile house. It is as much a dwelling as any house which is built on a foundation and therefore not mobile."* (emphasis supplied).

R. Perkins, *Criminal Law* (3d ed. 1982) at 255-56.

Generally a vehicle-type structure, used as a vehicle primarily for transportation purposes, should not be regarded as a dwelling house, even if occasionally used for sleeping. But as Perkins notes, cases have held such vehicles to be dwelling houses where the facts show that they are actually used as dwellings. The ability of a vehicle such as the Shasta to be considered as a dwelling house is supported by the decisions in other jurisdictions. *See, e.g., United States v. Lavender,* 602 F.2d 639 (4th Cir. 1979) (Winnebago mobile home held to be dwelling under breaking and entering statute where owner had testified that he used it as a home while on the road); *Copley v. Rona Enterprises, Inc.,* 423 F. Supp. 979 (S.D. Ohio 1976) (mobile home is a dwelling under Federal Truth in Lending Act); *United States v. Grooms,* 348 F.Supp. 1130 (D.C.M.D. Fla. 1972) (mobile home site is a dwelling

under the United States Fair Housing Act); *People v. Netznik,* 66 Ill. App. 3d 72, 383 N.E. 2d 640 (1978) (tent held to be building under burglary statute although not permanent so long as it was designed for the habitation of man; a tent, when erected and in use as a habitat or shelter, achieves a degree of permanence); *State v. Ryun,* 549 S.W.2d 141 (Mo. 1977) (mobile home/house trailer on farm held to be dwelling house where detached from its tow and immovable. The Court did observe that "whether the trailer must be licensed for use on the public highways and whether interfering with a trailer in some manner may be tampering with a motor vehicle are not relevant to the present inquiry."); *Commonwealth v. Mayer,* 240 Pa. Super. 181, 362 A.2d 407 (1976) (uninhabited trailer held to be dwelling house); *People v. Winhoven,* 65 Mich. App. 522, 237 N.W.2d 540 (1975) (mobile home held to be dwelling house for purpose of arson statute as "when a mobile home is used as a person's principal residence, it more nearly fits within the meaning of the dwelling house statute than the house trailer statute."); *Artman v. College Heights Mobile Park, Inc.,* 20 Mich. App. 193, 173 N.W.2d 833 (1969) (mobile home held to be dwelling house); *Harden v. State,* 417 S.W.2d 170 (Tex. Cr. App. 1967) (mobile home held to be a house when used as a residence); *Allstate Ins. Co. v. Walker,* 140 S.E.2d 910 (Ga. 1965) (house trailer held to be same as mobile home and thus it is a dwelling the same as any house built on a foundation and not mobile so long as it is used and intended to be used as a home); *Luce v. State,* 128 Tex. Cr. R. 287, 81 S.W.2d 93 (1935) (cabin constructed on top of automobile chassis held to be dwelling); *Martin v. State,* 57 S.W.2d 1104 (Tex. 1933) (tent may be a house within the meaning of burglary law); *State v. Ebel,* 92 Mont. 413, 15 P.2d 233 (1932) (movable sheepwagon, occupied by sheep herder as a dwelling house constituted a "home" and "building" under burglary statute); *Inter-Ocean Casualty Co. v. Warfield,* 292 S.W. 129 (Ark. 1927) (Quarter boat used by employees to sleep and eat while engaged in river improvement project held to be dwelling house during that particular time within the meaning of insurance policy covering burning of that

dwelling. "The structure was designed and used for the purpose of abode, and its character as such was not destroyed by the fact that it was floated up or down the river as the work of the government required."); *State v. Chauvet,* 83 N.W. 717 (Iowa 1900) (covered wagon, drawn from place to place, held to be house under statute prohibiting keeping of houses of ill fame despite its being on wheels and its capability of being moved); *State v. Jones,* 17 S.W. 366 (Mo. 1891) (barn in which person usually sleeps is a dwelling under arson statute). *See generally,* 12A C.J.S. *Burglary* § 34 (1980); Perkins, *Criminal Law, supra* at 255-59; LaFave and Scott, *Criminal Law* (1972) § 96 at 711-13.

*C.f., Aetna Life Ins. Co. v. Aird,* 108 F.2d 136 (5th Cir. 1939) (automobile trailer mounted on two wheels and not automotive or movable in and of itself held to be a building where it had been built for dwelling, movable from place to place and was at rest and occupied as a dwelling); *Knowles v. State,* 98 So. 207 (Ala. 1923) (tent in lumber camp held not to be a dwelling house where only furniture inside was an iron bed).

Acknowledging that California has taken a position opposite to that which we take today, we find the view of that jurisdiction to be unduly restrictive. In *People v. Moreland,* 81 Cal. App. 3d 11, 146 Cal. Rptr. 118 (1978), the California Court of Appeals held that under a statute prohibiting the discharge of a firearm at an inhabited dwelling house or occupied building, a 24 foot Winnebago recreational vehicle was neither an inhabited dwelling house nor an occupied building.[5]

5. A vigorous dissent in that case concluded that a 24-foot Winnebago motor home which was parked for the weekend near a residence on private property was an inhabited dwelling house.

Interpreting the statute in question, the dissent determined that the California legislature intended "to protect the inhabitants of a structure designed or altered or equipped for human habitation and being used as such from being killed or injured by a missle from a firearm." As such, the mobility of the structure is irrelevant. Further, the dissenting judge opined that the statute "should be construed flexibly with the principal objective of discouraging the social evil which the statute was designed to prevent." Responding to the majority, it concluded that a reasonable person would know that he was violating the statute by discharging a weapon into a known inhabited motor home being used as a dwelling.

The test in this jurisdiction as to whether a particular place is a dwelling house is whether it is used regularly as a place to sleep. *Poff v. State,* 4 Md. App. 186, 189, 241 A.2d 898 (1968). There must be more than sleeping at the location on rare occasions or taking an occasional nap there. *Id.; Herbert v. State,* 31 Md. App. 48, 51, 354 A.2d 449 (1976). The use of the word "house" in the statute does not require a permanent structure so long as persons intend to live in the structure and in fact use it as an abode for human habitation. Although the prior Maryland cases consistently use the word "building," this is only a result of our courts apparently never having had to examine a structure other than a typical building.

There was sufficient evidence produced at trial to enable a rational trier of the fact, *Jackson v. Virginia,* 443 U.S. 307 (1979), to find that the mini-motor home was a dwelling house. At trial, Rick Williams, a deputy in Harford County's Sheriff's Department, described the camper as:

> A 22 foot recreational vehicle. As soon as you walk in the door you make a left to go back towards the bedroom area. Walking back towards the bedroom areas, as soon as you pass the refrigerator, which is on the left-hand side and the sink, which is on the right-hand side, the bed — you run right into it. There is no bedroom per se. You more or less just walk to the end of the hallway and there is a bed right there.

Hudson and Becker had apparently resided and slept in the motor home. The interior contained a kitchen, sleeping and dining area, and the motor home was stationary and connected for electrical and sanitary conveniences. Significantly, the victim was, in fact, sleeping in the Shasta on the

---

This Court finds the reasoning undertaken in the dissent in *Moreland* to be the more rational approach to the issue. It confounds reason to suggest that the physical structure chosen by the inhabitant as his abode should affect the level of protection that the law will afford to his right of habitation. Accordingly, we do not believe that the majority opinion is persuasive and, as such, choose not to follow it.

night that she was murdered. Under these circumstances, the trial judge did not err in denying the motion for judgment of acquittal. Whether the Shasta fits the statutory definition of a vehicle under the transportation laws is irrelevant to our analysis and ultimate conclusion in this case, although we might reach a different result had the Shasta not been connected to health conveniences and were simply parked on a street rather than a campsite.

The case law makes clear that the crucial factor in determining whether a particular enclosure is a dwelling house is not whether the location is a formal traditional mortar and brick type of structure, but rather whether it is a place intended to be used, and in fact is used, as an abode and place for humans to sleep. The paramount interest that this law seeks to protect is the right of human habitation to be free from the terror of an invader. Accordingly, it matters not what type of facility the individual chooses to use for his habitation, so long as he intends it to be his abode and so uses it.

Article 27, § 30, as previously observed, embodies those offenses concerned with the breaking of a dwelling. Significantly, the successive statutes in that Article relate to the breaking of non-dwelling types of buildings or structures. We believe that this delineation of offenses is part of an underlying legislative determination as to the importance to be placed upon the protection of those dwellings which are to be used as places of human habitation. Indeed, as we observed in *Fields v. State,* 50 Md. App. 717, 720, 439 A.2d 1121 (1982):

> A pattern of legislative intent is apparent in the three successive sections of Art. 27, § 32 [Breaking outhouse, etc., or into boat with intent to commit felony], § 33 [Breaking into shop, etc., and stealing; restitution] and § 33A [Breaking into building or boat with intent to steal].
>
> Each have the common element of breaking into structures other than dwelling houses, structures to which we will apply the euphemism "storehouse."

On the facts before us, we cannot say as a matter of law that the Shasta was not a dwelling house. We hold that a rational trier of the fact could have found that on the night of Becker's murder, the Shasta mini-motor home in which she was sleeping was as much a dwelling house for purposes of the statute as if it were constructed of brick and mortar. *Jackson v. Virginia, supra.*

We do not hold that under all circumstances a motor home is a dwelling house. The issue of whether a particular building, structure or motor home is a dwelling house is a matter that must be determined as one of fact on a case by case basis. The trial judge recognized this and instructed the jury that "a dwelling house refers to a structure which is used regularly as a place to sleep. In order to find the defendant guilty . . . you must find that the camper or motor home was a structure regularly used as a place to sleep."

The trial judge did not err in denying appellant's motion for judgment of acquittal or in giving the above instruction.

## IV. *Psychiatric Testimony*

At trial, in order to show that appellant was an unwilling participant in the crimes, defense counsel sought to have a psychiatrist express an opinion about whether appellant's psychological profile was consistent or inconsistent with voluntary participation in the acts of violence and with prompt disclosure to the authorities. The trial judge rejected this evidence. In so doing, we hold that he did not abuse his discretion.

The trial court found that the proposed testimony offered an opinion on an ultimate issue in the case and rejected it on that basis. Our decision in *Waine v. State,* 37 Md. App. 222, 377 A.2d 509 (1977) is analogous. In *Waine,* we rejected a contention that a psychiatrist should have been permitted to testify concerning the unlikelihood of the defendant committing an act of violence. We observed:

> Whether an expert's opinion will assist the trier of fact is a decision for the trial judge.

> "The general rule is that the allowance or disallowance of the testimony of expert witnesses is addressed to the sound discretion of the trial court and the exercise of that discretion will not be disturbed on appeal unless such ruling is clearly erroneous or there has been a clear abuse of discretion." *Brown, supra* at 11.

> In the case at bar, we agree with the appellant that the jury was entitled to the opinion of a qualified expert concerning the appellant's psychological makeup in deciding whether to believe the defense that he was a passivist. *See United States v. Staggs,* 553 F.2d 1073 (7th Cir. 1977). This type of testimony the trial court in the instant case allowed. The trial judge did not allow a conclusion to be admitted which was not supported by a reasonable medical certainty. The witness proferred that there "is no way in the world I can say he didn't commit these [homicides] but I can say according to his lifestyle, this would be totally out of character." In other words, the witness stated that he could not give an ultimate conclusion as to whether the appellant committed the homicides, but he could testify as to the appellant's peaceful disposition. We can find no abuse of discretion on the part of the trial judge when he allowed testimony concerning the psychological makeup of the appellant but not an ultimate conclusion, which the doctor admitted he was not competent to make.

37 Md. App. at 246-47, 377 A.2d at 523.

In the instant appeal, we find no abuse of discretion in the trial court's rejection of this evidence. This is especially true in light of the fact that the expert testified about the psychiatric makeup of the appellant which indicated that he was passive and easily led. There was no error in this regard.

## V. *Varying the Order of Proof — Rebuttal Testimony*

After the appellant had closed its case in chief, the State sought to introduce the testimony of four rebuttal witnesses. It was proferred that Stephen Rassa would testify that on May 20, 1981, shortly before purchasing cocaine from Hudson and Becker, Kanaras supposedly had to be dissuaded from robbing Hudson and stealing his cocaine. It was further proferred that Dale Saunders, Jr. would testify that Huffington and Kanaras came to "shake him down for money" due on a drug debt. Maryland State Trooper Gary Aschenbach, according to the State's proffer, would testify that while working undercover in early 1981, Kanaras had purchased drugs for him, had on one occasion carried a gun in anticipation of a large drug deal, and had expressed interest in an illegal scheme to destroy a boat for money. The testimony of Thomas Wagner, according to the State, would show that Kanaras had shown him what was to be the murder weapon.

Counsel for the appellant objected. It was argued that this testimony, if permitted, would be in violation of the "other crimes" pretrial agreement and that the State was attempting to disprove answers to certain improper questions. The State responded by claiming that the evidence would be introduced to prove a motive for the crime. In open court, the trial judge declared:

> With respect to the issue ot (sic) whether the State may put on additional evidence in rebuttal, the Court is going to permit the State to put on additional evidence, and in fairness permit the Defense to offer surrebuttal if it cares to. . . So in exercising my discretion and in fairness to both the State and defendant the Court will permit the State to vary the order of proof and the defendant to offer additional evidence if it cares to after the State's evidence is introduced. By this ruling, I do not mean to indicate that I find what the State is offering is not true rebuttal testimony.

In reaching his conclusion, Judge Rasin relied upon *State v. Hepple,* 279 Md. 265, 273, 368 A.2d 445 (1977) where the Court of Appeals had opined:

We further point out that it is of no consequence that the trial judges might have allowed the testimony pursuant to their discretion to deviate from the conventional order of producing evidence, because we are convinced that in both cases this discretion was not exercised. *The fact that the prosecution made no motion to reopen in either case is not dispositive, of course, since the court could have invoked its discretionary power sua sponte;* because there is no indication here, however, that either court was exercising its discretion to vary the normal mode of presentation of evidence, we cannot uphold the admission of the disputed testimony, even if we were convinced, looking at the record in retrospect, that the trial court could have properly allowed that testimony pursuant to this discretionary authority. *Cf. People v. Katz,* 207 Cal. App. 2d 739, 24 Cal. Rptr. 644, 649-51 (Dist. Ct. App. 1962); *State v. Director,* 113 Or. 74, 231 P. 191, 196 (1924). This is so because *if testimony is admitted at the rebuttal stage, but only pursuant to the trial court's discretion to vary the order of proof, the defense must be afforded the same opportunity to investigate and attempt to impeach or otherwise respond to the State's witness as it would have had had the evidence been offered in chief. See Bannon v. Warfield, supra,* 42 Md. [22] at 39 [(1875)]. *Our decision today in no way restricts the exercise of the trial court's discretion to allow non-rebuttal evidence at the rebuttal stage of a trial — it merely requires that a change in the normal order of presentation of evidence be in fact an exercise of the Court's discretion.* (emphasis in original deleted; emphasis supplied).

Thus, the trial judge varied the order of proof and allowed the State to reopen its case in chief. However, he admonished the jury that:

Now, ladies and gentlemen of the jury, I want to give you an instruction at this time with respect to the last two witnesses as well as other witnesses that are called in the nature of rebuttal witnesses. That is, the State calling them back after they have put on their case before the Defendant was then permitted to offer any evidence the Defendant wanted to offer. In talking about — I want to talk to you about credibility or believability of witnesses. I will tell you in my final instruction that the jury, you, has to make the determination as to who to believe and who not to believe, and what to believe and what not to believe. Now the State is calling these witnesses for the purpose of offering testimony with respect to the testimony of the Defendant's witnesses. So you are listening to the testimony of the State's witnesses in rebuttal, to consider that information as to what you are going to believe and what not to believe, or to the extent that you are going to believe the testimony offered by the Defendant. Any testimony offered by the Defendant's witnesses, or the Defendant himself. And in assessing the testimony of Mr. Rassa or Officer Aschenbach, or any other witnesses that the State calls, you also have to determine the credibility of that testimony. So after determining the credibility of the rebuttal witnesses then you consider it as to whether you are going to believe or disbelieve a portion or all of the testimony of any witnesses offered by the Defendant, or the Defendant himself. You heard testimony about drug transactions. None of that testimony as to drug transactions, if you find that drug transactions took place that involve this Defendant, none of that testimony or evidence can be used for you to draw

conclusions as to his guilt of the charges pending against him in this case. He isn't on trial for any alleged drug transactions, whether it took place or not. And even if you believe that any drug transaction took place that cannot be used by you as evidence that therefore he must be guilty of some of the charges now pending against him in this trial. The sole purpose of your hearing that testimony is for you to assess the credibility of Mr. Kanaras' testimony or the credibility of any other witnesses' testimony that may have been touched upon by any rebuttal witness or rebuttal witness to come. So that's *the only reason why the Court has permitted the State to put on this type of testimony, is for you to make the determination as to whether or not what you heard from the defense witnesses is believable or not believable in part or in its entirety.* Now I hope you understand the basis for hearing this testimony, because you must not use it in drawing any conclusions of guilt, but you may only use it in assessing the credibility or believability of the Defendant's testimony and evidence. (emphasis supplied).

During the reopening of the case in chief, the State offered the testimony of the four witnesses previously mentioned. Rassa testified that he accompanied Kanaras on May 20, 1981 when Kanaras had attempted to pawn jewelry and had purchased methamphetamine. He also testified that Kanaras carried a gun into Hudson's camper during a drug purchase and that Rassa was nervous because he believed that Kanaras was going to rob Hudson. Saunders testified that Kanaras had accompanied Huffington to Saunders' house and that on that occasion Huffington had threatened to "get physically violent" if Saunders did not settle a drug debt with Huffington. Gary Aschenbach's testimony indicated that while Aschenbach had been working undercover, Kanaras had carried a gun during a drug purchase, and had seemed very excited at the prospect of

earning $10,000.00 by blowing up a boat as part of an insurance fraud. As the final State witness, Wagner testified that while in Kanaras' automobile, the appellant had sought to sell him a .38 caliber pistol, later identified as the murder weapon. Kanaras then testified once again in his own behalf.

On appeal, appellant contends that the trial judge abused his discretion and committed reversible error by varying the order of proof. Assuming *arguendo* that the trial judge was theoretically incorrect by allowing the State to introduce the rebuttal evidence under the guise of reopening its case in chief, we hold that there was no reversible error as the evidence received was proper as rebuttal evidence.

There is a distinction to be made between reopening a case in chief and offering rebuttal evidence. In *Huffington v. State,* 295 Md. 1, 14-15, 452 A.2d 1211 (1982) the Court of Appeals discussed this distinction and adopted the language of this Court in *Hepple v. State,* 31 Md. App. 525, 534, 358 A.2d 283, 290 (1976):

> The two discretions enjoyed by the trial court, the one to permit the moving party to reopen its case to introduce evidence adducible in chief, and the other, to determine whether evidence offered to rebut is truly rebuttal evidence, are separate and distinct. As to both, of course, the evidence must be competent, relevant and material. With respect to reopening the case, the judge must consider whether the State deliberately withheld the evidence proffered in order to have it presented at such time as to obtain an unfair advantage by its impact on the trier of facts. To this end the judge must see whether the proposed evidence is merely cumulative to, or corroborative of, that already offered in chief or whether it is important or essential to a conviction. With respect to rebuttal evidence, the judge must consider whether the evidence explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the accused. Thus, the considerations involved in the

exercise of the two discretions are materially differ- ent. The sound exercise of discretion to allow the State to reopen its case provides no basis for finding that evidence meets the definition of rebuttal evi- dence, and *vice versa.*

In determining what is rebuttal evidence, we give great deference to the discretion of the trial court, and an appellate court will not reverse for an error on this point unless the ruling of the court below was both manifestly wrong and substantially injurious. *Hepple v. State, supra,* 31 Md. App. at 530, 358 A.2d at 288; *affirmed* 279 Md. 265, 368 A.2d 445 (1977). And even if the trial court clearly rules that certain testimony is not rebuttal evidence, the court may nonetheless exercise its discretion to vary the order of proof and admit it as part of the case in chief at the rebuttal stage in order to meet the requirements of a particular case, so long as this action does not impair the ability of the defendant to answer and otherwise receive a fair trial. *Huffington v. State, supra,* 295 Md. at 14, 452 A.2d at 1217.

In the instant appeal, the rebuttal testimony clearly explained and replied to the evidence which had been offered by the appellant in his defense. Kanaras had agreed to the accuracy of the language of the statement which he had given Saneman, which included the response that "I never sold drugs. I always bought them." Thus, the State was enti- tled to prove that Kanaras had been involved in drug transactions as a seller. Judge Rasin correctly observed that the central matter at issue in the case was drugs. When the defendant asserted that he was not a drug dealer, the State was entitled to rebut this evidence. Additionally, as discussed *infra,* motivation evidence would have been proper in this regard. Even assuming arguendo that part of the rebuttal evidence was not truly rebuttal evidence (for exam- ple, evidence concerning the gun or motivation), we believe that it was not presented in such a manner as to obtain an unfair advantage by its impact on the trier of facts. Nor was it cumulative or corroborative. Accordingly, as to that which may not be rebuttal evidence, it would not have been an

abuse of discretion on the part of the trial judge to permit the State to reopen its case in chief. The appellant was both given the opportunity and took advantage of the opportunity to present evidence in surrebuttal. Under these circumstances, he was not prejudiced by the manner in which the new evidence was admitted. This is especially true in light of the instruction from the trial judge to the jury limiting the rebuttal testimony to the question of credibility, which in practical effect gave the appellant more than he legally was entitled to. The trial judge did not abuse his discretion. As the ruling of the trial court was neither manifestly wrong, nor substantially injurious, we shall not reverse on this assignment of error.

## VI. *Evidence of Motive*

Claiming that "the prosecution improperly sought to paint him as a ruthless and desperate individual who would do anything to satisfy his drug habit," appellant's final contention is that the State's motive evidence should not have been admitted. We disagree.

Initially, we reiterate our approval of Judge Rasin's comment that the central issue in the case was drugs. Additionally, an important facet of the State's case was to prove that the appellant was a voluntary participant in the crimes. As such, it was proper to show that Kanaras both needed and lusted for money, had participated in prior drug transactions, and may have specifically considered robbing Hudson. The additional State's evidence supplied a motive for the crimes and supplied evidence of advance preparation for the crimes. As such, it was admissible to show an independent intent and motive to commit the crimes. *See, Meyerson v. State,* 181 Md. 105, 109, 28 A.2d 833 (1942). Appellant's reliance on *Vitek v. State,* 295 Md. 35, 453 A.2d 514 (1982) is misplaced. In the case *sub judice* there was more than "a general suspicion" that because appellant needed money, he was about to commit a crime. The evidence showed that appellant had sought to borrow money, seemed excited

at the prospect of earning it illegally, and may have considered robbing Hudson for money. The underlying motivation evidence of drugs and money was properly admitted. The trial judge did not abuse his discretion in that regard. *See, Cross v. State,* 282 Md. 468, 386 A.2d 757 (1978).

Finding no merit to appellant's claims of error, we affirm the judgment of the Circuit Court for Kent County.

*Judgments affirmed; appellant to pay the costs.*