500 A.2d 272

**John Norman HUFFINGTON**

v.

**STATE of Maryland.**

**Nos. 64, 133 Sept. Term, 1984.**

Court of Appeals of Maryland.

Nov. 13, 1985.

562

Michael Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender and George E. Burns, Jr., and David R. Durfee, Jr., Asst. Public Defenders, on brief), Baltimore, for appellant.

Valerie J. Smith, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

SMITH, Judge.

We shall affirm the conviction and sentence of John Norman Huffington in this, his third trip to this Court, the second after a death sentence. His first trip was reported in *Huffington v. State*, 295 Md. 1, 452 A.2d 1211 (1982), where we reversed and remanded for a new trial. Upon the remand after that reversal the case was removed to the Circuit Court for Frederick County for trial. In *Huffington v. State*, 302 Md. 184, 486 A.2d 200 (1985), we rejected his contention that to again try him would place him in double jeopardy. After our per curiam order in that case (but before the filing of the opinion) Huffington was tried in the Circuit Court for Frederick County. A jury convicted him of two counts of first degree murder, breaking and entering, and handgun offenses. The same jury sentenced him to death for each murder. The case reaches us under the provisions of Maryland Code (1957, 1982 Repl.Vol.) Art. 27, § 414 providing for automatic review by this Court whenever the death penalty is imposed.

The facts surrounding the incident leading to Huffington's conviction are fully set forth in our earlier opinion. We shall here set forth only such facts as are necessary to a clear understanding of each of the issues presented by Huffington in his appeal. We shall consider his contentions seriatim.

i. Refusal to admit the testimony given by Rassa at the trial of Kanaras

■ Deno Kanaras was the alleged accomplice of Huffington in the incidents here in question. Kanaras was convicted by a Kent County jury of felony murder, theft, and daytime housebreaking. See *Kanaras v. State*, 54 Md.App. 568, 460 A.2d 61, *cert. denied*, 297 Md. 109 (1983). At Kanaras' trial Stephen Rassa testified in rebuttal as a State's witness. Prior to that rebuttal testimony Kanaras had testified that he had been free from drugs for some

time before the homicides in question. The purport of Rassa's testimony was that a few days before the incident in question Kanaras was still involved with drugs. Rassa told of a visit made by him and Kanaras to the homicide victims for the purpose of purchasing cocaine. At Kanaras' trial Rassa testified that Kanaras "said he wouldn't mind robbing Joe Hudson and killing him." Rassa said that five days before Hudson and Becker, the victims in the case at bar, were actually killed, when Rassa and Kanaras approached Hudson's trailer for the purpose of purchasing cocaine, Kanaras entered first armed with a gun and with a knife.

After laying a foundation of unsuccessful attempts to subpoena Rassa as a witness, Huffington offered the record of Rassa's testimony at the Kanaras trial in Kent County. He sought its admission as prior evidence to establish that Kanaras might have killed the victims in the case at bar. The trial judge denied admission, stating:

"The whole thrust of the cases in this area is that the right of cross-examination be fully afforded, and if it has not been afforded, then it is not only a violation of Article 21 of the Maryland Constitution but also before [sic] the amendment to the United States Constitution. It's clear from the proffered testimony in this case, and I find as a fact, that in the trial in which the Rassa transcript is sought to be used, Mr. Rassa was the State's witness, and accordingly, to grant your motion I would be depriving the State of its right to cross-examine fully Mr. Rassa in this case, which is a different case from the present case. The case in which the transcript is from, as I understand it, is the *State v. Kanaras* rather than the *State v. Huffington,* and so the situation is entirely different from the situation which caused me to grant the State's motion in connection with the Bognani testimony. Accordingly, the motion is denied."

There is no dispute here on the issue of Rassa's availability as a witness.

The rule applicable to prior testimony was set forth for the Court by Chief Judge Murphy in *Crawford v. State,* 282 Md. 210, 383 A.2d 1097 (1978):

> "Our predecessors have consistently held that testimony taken at a former trial may as a general rule be admitted at a subsequent trial where it is satisfactorily shown that the witness is unavailable to testify. *Contee v. State,* 229 Md. 486, 184 A.2d 823 (1962); *Bryant v. State,* 207 Md. 565, 115 A.2d 502 (1955); *Hendrix v. State,* 200 Md. 380, 90 A.2d 186 (1952). These cases generally recognize that where an opportunity was afforded to the accused to cross-examine the witness at the former trial, there is no violation of the state or federal constitutional right of confrontation. The rule has generally been applied without distinction between the admissibility of testimony given at a former trial and testimony given at a preliminary hearing since, as Professor McCormick states:
>
>> 'If the accepted requirements of the administration of the oath, adequate opportunity to cross-examine on substantially the same issue, and present unavailability of the witness, are satisfied then the character of the tribunal and the form of the proceedings are immaterial, and the former testimony should be received....'
>>
> McCormick, *Evidence* § 258 (2d ed. 1972).
> Other text writers are in accord. *See* 2 *Jones on Evidence* § 9.22 (6th ed. 1972); 3 *Wharton's Criminal Evidence* § 650 (13th ed. 1973)." 282 Md. at 214–15, 383 A.2d at 1100.

The rule was recognized ninety years ago in a criminal context by the Supreme Court. *See Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895). The Court discussed such testimony in the context of a claim that admission of testimony would violate the constitutional provision relative to confrontation of witnesses:

> "The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases,

being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused." 156 U.S. at 242–43, 15 S.Ct. at 339–40, 39 L.Ed. at 411.

On the issue in question see Annot., 15 A.L.R. 495 (1921), and the supplements thereto, 79 A.L.R. 1392 (1932), 122 A.L.R. 425 (1939), and 159 A.L.R. 1240 (1945). Obviously, as pointed out in 15 A.L.R. at 559, there can be no constitutional objection to admission of evidence on *behalf* of an accused in a criminal proceeding. The further observation is made that in admitting testimony on behalf of an accused courts generally have followed the rules which they have adopted with respect to permitting or rejecting testimony in favor of the prosecution.

On the problem at hand E. Cleary, *McCormick's Handbook of the Law of Evidence,* § 254 (3d ed. 1984) states:

"Usually called 'former testimony', this evidence may be classified, depending upon the precise formulation of the rule against hearsay, as an exception to the hearsay prohibition on the one hand, or as a class of evidence where the requirements of the hearsay rule are complied with, on the other. The former view is accepted generally by the courts, rules, and textwriters; the latter was espoused by Wigmore." *Id.* at 759–60.

On cross-examination McCormick states in § 255:

"More important, and more often drawn in question, is the requirement that the party against whom the former testimony is now offered, or a party in like interest, must have had a reasonable opportunity to cross-examine. Actual cross-examination, of course, is not essential, if the opportunity was afforded and waived. The opportunity must have been such as to render the conduct of the cross-examination or the decision not to cross-examine meaningful in the light of the circumstances which prevail when the former testimony is offered." *Id.* at 761–62.

McCormick also mentions another frequent issue in § 256, that of identity of parties:

"[T]he natural next step is to recognize, as progressive courts have done, that neither identity of parties nor privity between parties is essential. These are merely means to an end. Consequently, if it appears that in the former suit a party having a like motive to cross-examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination, the testimony may be received against the present party. Identity of interest in the sense of motive, rather than technical identity of cause of action or title, is the test." *Id.* at 765.

The importance of cross-examination is explained by Martin, *The Former-Testimony Exception in the Proposed Federal Rules of Evidence,* 57 Iowa L.Rev. 547 (1972):

"Given the faith which the Anglo-American adversary system places in the efficacy of cross-examination, it is not surprising that the most important feature of the former-testimony exception is that which requires such testimony to have been given in a situation where an opportunity existed to utilize that truth-testing device. The former-testimony exception to the hearsay rule is unique in this respect, as no other exception makes cross-examination a requirement for admissibility, and it is not usually discussed in connection with evidence admitted under other exceptions. It was this opportunity to cross-examine which led Wigmore to characterize former testimony as unobjectionable under the hearsay rule, rather than as admissible as one of its exceptions. In order to ensure the reliability of former testimony, the proposed Federal Rules retain the requirement that the opponent be given the opportunity to develop the testimony by cross-examination." *Id.* at 553–54.

Professor Martin says, "[The] crucial question is whether, given that the opponent can not now cross-examine the witness, the examination on the prior occasion was fairly equivalent to cross-examination in the present situation." *Id.* at 556.

Fed.R.Evid. 804(b)(1) states:

"(b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony.—Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

The issue of cross-examination is discussed in J. Weinstein & M. Berger, 1 *Weinstein's Evidence* ¶ 804(b)(1)[02]:

"The prime guaranty of reliability in the case of prior testimony or depositions resides in their having been subjected to cross-examination prior to the present trial. When this condition and the requirement of an oath are met, the character of the tribunal before which the former trial was held is immaterial. 'If the tribunal was empowered to compel cross-examination, or did in fact compel cross-examination, the prior testimony should be admissible.' Similarly in the case of depositions, the condition of cross-examination is satisfied if the deposition is taken 'before an officer authorized by law to take depositions and empowered to compel cross-examination.' If the opportunity to cross-examine was lacking the prior testimony must be excluded. Even should it be determined that the tribunal conducting the original hearing lacked jurisdiction, admission of the prior testimony should depend on 'whether the sworn statements of the witness, now dead or unavailable, about the facts of which he had knowledge, were made under such circumstances of opportunity and motive for cross-examination as to make them sufficiently trustworthy to be used in the effort to ascertain the truth.'

"Actual cross-examination is not required, 'but merely an *opportunity to exercise the right to cross-examine if desired.*' Respresentation by the same counsel at both trials is not required. If the party against whom the previous statement is now offered is the party against whom the testimony was previously offered, it is usually compatible with fair practice to make him bear the consequences of any deficiencies in the cross-examination or decision not to exercise that right. But situations may arise where because of particular circumstances, the existence of an opportunity to cross-examine would not have resulted in any testing of the reliability of the previous statement, where the conduct of the cross-examination or the decision not to cross-examine is not 'meaningful in the light of the circumstances which prevail when the former

testimony is offered.' " *Id.* 804–74 to –76. (Emphasis in original.)

The case relied upon by the State that is closest to the factual situation before the Court is *Commonwealth v. Meech,* 380 Mass. 490, 403 N.E.2d 1174 (1980). There the defendant attempted to introduce at his trial testimony given by a witness for the prosecution before the grand jury. The court said:

"The common model for the exception is one where the prior testimony was given by a person, now unavailable, in a proceeding addressed to substantially the same issues as in the current proceeding, with reasonable opportunity and similar motivation on the prior occasion for cross-examination of the declarant by the party against whom the testimony is now being offered. . . .

"The usual formula would not be fulfilled if grand jury testimony were subsequently offered against the indicted defendant, for he would not have had a chance to cross-examine. See *United States v. Fiore,* 443 F.2d 112, 115 & n. 3 (2d Cir.1971), cert. denied, 410 U.S. 984 [93 S.Ct. 1510, 36 L.Ed.2d 181] (1973). Nor is it nominally fulfilled where, as here, the defendant offers the testimony against the Commonwealth, for the Commonwealth was not in the position of a cross-examiner at the grand jury hearing; rather it was presenting the testimony through direct examination. However, it has been recommended by commentators, and on occasion held by courts, that a party's having tendered the testimony on direct should serve as the equivalent for the present purpose of his having cross-examined upon it. There is some support for this view as to grand jury testimony on the theory, perhaps, that the government should be considered bound to the trustworthiness of the evidence it chose to present to the grant jury as a basis for an accusation of crime. (See, however, note 12 *infra.*)

"But even if the proposition were accepted that the defendant might in some circumstances use the grand jury testimony of a now unavailable witness at trial,

McDonald's testimony would still be of dubious acceptability. · For it is an important ground of this hearsay 'exception' that there be substantial identity between the issues at the earlier and later proceedings—this to ensure 'that the former handling of the witness was the equivalent of what would now be done if the opportunity were presented.' Where this similarity is absent, the testimony will not be fortified in the material respect—that is, in its relation to the particular proposition sought to be proved in the later proceeding. See *United States v. Wingate,* 520 F.2d 309, 316 (2d Cir.1975); *State v. Augustine,* 252 La. 983, 999 [215 So.2d 634] (1968). The problem is encountered here. The Commonwealth's purpose in examining McDonald before the grand jury was not to inquire into the defendant's criminal responsibility; it was to provide eyewitness proof about the defendant's possession of the supposed murder weapon in the vicinity of the crime near the time of death." 380 Mass. at 494–96, 403 N.E.2d at 1177–78.

*United States v. Atkins,* 618 F.2d 366 (5th Cir.1980), is instructive. The court there said:

"Admission of Inglet's testimony, given during government cross-examination of him in a December 19, 1978, *James* [1] hearing, also was not erroneously denied. Fed. R.Evid. 804(b)(1) permits admission of former testimony if the declarant is unavailable at trial and 'if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.' The defendant sought to use Inglet's testimony that his source of cocaine in Miami was a man named Robert, whose last name he did not know, in order to establish that Inglet was dealing with someone other than Robert Atkins, whose name was known to Inglet. Defense counsel for

---

**1.** *"James"* refers to *United States v. James,* 590 F.2d 575 (5th Cir.1979) (en banc) pertaining to the introduction of co-conspirators' statements.

Atkins did not participate in the *James* hearing, and the hearing did not concern Atkins but only some of his codefendants. In addition, the government did not contend that Atkins was the Miami supplier being discussed by Inglet in the *James* hearing but rather that he was the contact man. Thus, the government did not have the motivation to question Inglet in order to make him acknowledge that the Robert of whom he spoke in the James hearing was in fact Atkins. Accordingly, Inglet's former testimony did not meet the requirements of 804(b)(1) for admission, and his challenge to its exclusion by the judge is without merit. *See, e.g., Peterson v. United States*, 344 F.2d 419, 425 (5th Cir.1965)." 618 F.2d at 373.

We find *Atkins* persuasive. It follows along with the authorities we have heretofore quoted. When the State presented the testimony of Rassa at Kanaras' trial it was in a different context and for a different purpose from that for which Huffington desires to offer it in the case at bar.[2] The motivation on the part of the State for questioning Rassa was entirely different at that trial from the motivation the State would have had to question Rassa on cross-examination at Huffington's trial had Rassa been present as a live witness to offer the testimony sought to be introduced. Much has been written on the importance of

---

**2.** We take cognizance of the fact that the dissent differs with our view as to the purpose for which the Rassa testimony was offered at the trial of Kanaras. We point out that in *Kanaras v. State*, 54 Md.App. 568, 460 A.2d 61, *cert. denied*, 297 Md. 109 (1983), Judge Alpert said for the Court of Special Appeals:

"In the instant appeal, the rebuttal testimony clearly explained and replied to the evidence which had been offered by the appellant in his defense. Kanaras had agreed to the accuracy of the language of the statement which he had given Saneman, which included the response that 'I never sold drugs. I always bought them.' Thus, the State was entitled to prove that Kanaras had been involved in drug transactions as a seller. Judge Rasin correctly observed that the central matter at issue in the case was drugs. When the defendant asserted that he was not a drug dealer, the State was entitled to rebut this evidence." 54 Md.App. at 594, 460 A.2d at 75–76.

cross-examination. In the words of the federal rule the party against whom the testimony is now offered did not have at the time of Kanaras' trial a similar motive in developing the testimony of Rassa. Given the wide discretion which trial judges have in admitting evidence, we find no error on the part of the trial judge.

ii. Mitigating factor of not being the sole proximate cause of the victim's death

■ Code (1957, 1982 Repl.Vol.) Art. 27, § 413(g)(6) provides that a mitigating factor which a sentencing authority may find to exist is that the act of the defendant was not the sole proximate cause of the victim's death. Huffington contends that because his cohort, Kanaras, was convicted of felony murder in the death of Becker (one of the individuals found to have been murdered by Huffington), then Huffington is entitled as a matter of law to an instruction in his favor on this mitigating factor.

There is both a short and a somewhat longer answer to Huffington's contention. The short answer is that at no time did he request such an instruction. Not having requested such an instruction, the point is deemed waived. Maryland Rule 885.

■ A somewhat longer answer is that the sentencing authority, in this instance the jury, would be expected to return its finding based upon the evidence adduced before it. Evidence of Kanaras' conviction was not adduced. Had it been, the finding made by the jury at Kanaras' trial would not be binding upon the jury at Huffington's trial because it would not be based upon the same evidence.

The real answer is that contained in *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985), where Judge Eldridge said for the Court:

"[W]e conclude that the General Assembly intended the words 'proximate cause' to apply only to direct physical causes of the victim's death, and not to acts of a principal in the second degree or an accessory before the fact

which aided or abetted the act directly causing death." 304 Md. at 534, 499 A.2d at 1285.

Footnote 16 of that opinion provides further clarification:

"The type of situation which the Legislature likely had in mind by the language of § 413(g)(6) is illustrated by the following. If the perpetrator inflicts a serious wound under circumstances that would justify a conviction for murder if death should ensue, and death does ensue partly by reason of negligent medical treatment or refusal of the victim to accept medically recommended care, the perpetrator will not be excused from liability for the murder. *See DeVaughn v. State,* 232 Md. 447, 194 A.2d 109 (1963), *cert. denied,* 376 U.S. 927, 84 S.Ct. 693, 11 L.Ed.2d 623 (1964). Nevertheless, in a capital punishment case there would exist as a mitigating factor an additional proximate cause of death.

"We need not in this case, however, explore the range or scope of acts which might fall within the language of § 413(g)(6). We go no further than our holding that the act of a principal in the second degree or accessory before the fact is not what the Legislature had in mind." 304 Md. at 534–35, 499 A.2d at 1286.

Huffington simply was not entitled to such an instruction.

### iii. The presentence investigation report

■ Code (1957, 1982 Repl.Vol., 1984 Cum.Supp.) Art. 41, § 124(d), adopted by Ch. 297 of the Acts of 1983 and effective July 1, 1983, provides:

"In any case in which the death penalty is requested under Article 27, § 412, a presentence investigation, including a victim impact statement, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Article 27, § 413."

Code (1957, 1982 Repl.Vol.) Art. 27, § 413(c)(1)(iv) states that evidence admissible in a capital sentencing proceeding includes "[a]ny presentence investigation report."

Huffington contends that the trial court erred in admitting two portions of the presentence investigation report. The first concerns that portion of institutional history pertaining to infractions not leading to criminal prosecutions committed while Huffington was incarcerated prior to trial. The second pertains to the admission of Huffington's version of the facts pertaining to his activities at the times here pertinent.

For reasons to be hereafter developed we find Huffington's contentions to be without merit. There is another reason for overruling his contentions, however. The presentence investigation came in without objection. It is true that when the presentence investigation was being considered by the trial judge Huffington made specific objections to the portions of the report to which he now objects. However, the report was received in evidence without objection on behalf of Huffington. The record reflects:

"Cassilly [Assistant State's Attorney]: Excuse me, Your Honor, could we ... now that we've finally gotten our presentence put together, can we distribute this to the Jury at this point?

"Court: You'll want to put that in? Yes.

"Cassilly: Yes, please.

"Drew [for the defense]: I have no objection, Your Honor, if you want....

"Court: All right, it will be received and may be distributed to the Jury. (St.Ex. 5 admitted into evidence. PSI, with deletions; photostat.)

"Drew: Your Honor, I don't have any problem with it being distributed but I'd ask that the Court instruct the Jury not to begin reading it or anything until .... I'd like them to pay attention to my presentation rather than reading the PSI."

a. The institutional history

■ The section of the presentence investigation report pertaining to institutional history states:

"On or about 12/6/83 the defendant, John Norman Huffington was cited for 1) refusing to obey a direct order and 2) creating a security threat. The defendant received ten days in disciplinary isolation for each of those infractions.

"Evidently the defendant offered resistance to Deputy Minnick while being searched. As to the second infraction the defendant apparently interfered with the searching of other inmates in the cell block."

*Bartholomey v. State*, 267 Md. 175, 297 A.2d 696 (1972), involved the Maryland death sentence cases remanded to us by the Supreme Court of the United States for reconsideration in the light of its holding in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In discussing the procedure to be followed by trial judges in re-sentencing those defendants, Chief Judge Murphy said for the Court:

"[T]o aid the sentencing judge in fairly and intelligently exercising the discretion vested in him, the procedural policy of the State encourages him to consider information concerning the convicted person's reputation, past offenses, health, habits, mental and moral propensities, social background and any other matters that a judge ought to have before him in determining the sentence that should be imposed. *Skinker v. State*, 239 Md. 234, 210 A.2d 716 (1965); *Scott v. State*, 238 Md. 265, 208 A.2d 575 (1965); *Costello v. State*, 237 Md. 464, 206 A.2d 812 (1965); *Driver v. State*, [201 Md. 25, 92 A.2d 570 (1952)]; *Baker v. State*, [3 Md.App. 251, 238 A.2d 561 (1968)]. The sentencing judge may, but need not, obtain a presentence report under Article 41, § 124(b). Of course, the sentencing judge may take into consideration the defendant's conduct after the offense was committed, *viz.*, he may consider evidence of events occurring after the date

of the original sentencing to whatever extent he may deem necessary. *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *Purnell v. State*, [241 Md. 582, 217 A.2d 298 (1966)]; *Gatewood v. State*, 15 Md.App. 450, 291 A.2d 688 (1972)." 267 Md. at 193–94, 297 A.2d at 706.

More recently in *Logan v. State*, 289 Md. 460, 425 A.2d 632 (1981), Judge Digges said for the Court:

"In considering what is proper punishment, it is now well-settled in this State that a judge is not limited to reviewing past conduct whose occurrence has been judicially established, but may view 'reliable evidence of conduct which may be opprobrious although not criminal, as well as details and circumstances of criminal conduct for which the person has not been tried.' *Henry v. State*, 273 Md. 131, 147–48, 328 A.2d 293, 303 (1974)." 289 Md. at 481, 425 A.2d at 643.

We are not concerned here with crimes, as in *Scott v. State*, 297 Md. 235, 465 A.2d 1126 (1983), with which an accused was charged but had not yet been convicted. We believe that under our prior cases this institutional history was properly admissible.

### b. Huffington's statement

■ It is customary in a presentence investigation for the defendant's version of the relevant facts to be set forth. The events leading to the death of the victims apparently occurred in the early morning hours of May 25, 1981. Huffington has summarized in his brief the relevant evidence adduced at trial. That pertaining to the critical time is:

"At 2:00 a.m., Appellant, Kanaras, Hudson and Becker all left the nightclub and drove to the trailer. Once inside the trailer, Appellant paid Hudson $275.00 for three and one-half grams of cocaine. At that point, all concerned had ingested various quantities of cocaine and marijuana.

"After completing the transaction, Appellant and Kanaras returned to Appellant's apartment and ingested more cocaine. Appellant then began making telephone calls in an effort to find a buyer for additional cocaine retained by Hudson. Appellant ostensibly found a buyer, and had Kanaras drive him back to Hudson's trailer. Arriving between 3:30 and 4:00 a.m., they picked up Hudson and drove him to the rural Wheel Road area of Harford County. According to Kanaras, after the three men exited the car Appellant shot and killed Hudson and removed a quantity of cocaine from the latter's pocket.

"Appellant then turned the gun on Kanaras, forcing him to drive back to the Hudson trailer for the purpose of stealing money. Once inside the trailer, Appellant killed Diane Becker by striking her on the head with a vodka bottle and then stabbing her some 33 times with a knife. Under duress, Kanaras then helped Appellant steal a large amount of cash and Becker's purse, which contained narcotics and paraphernalia.

"Kanaras' testimony continued that for the next several hours he remained with Appellant, helping him to dispose of evidence and to establish an alibi by attending a local 'fiddler's convention.' Kanaras remained with Appellant and refrained from informing anyone of the killings even after the disposal of the gun and knife used in the homicides because he remained 'scared' of Appellant."

The version obtained by the Parole and Probation agent as set forth in the presentence investigation report was as follows for the critical period:

"About 1:45 a.m. the defendant and Kanaras left the Golden 40 and followed Hudson's car to an Edgewood 7–11 Store and then to Hudson's Motorhome. Diane Becker walked over to their car and asked them to wait until the people in the other car left. After the other vehicle left, the defendant and Kanaras entered the motorhome and all four (4) sat down. Hudson and the defendant discussed a future cocaine deal and Kanaras

bought some cocaine from Hudson, after which Huffington and Kanaras left. They drove back to Huffington's apartment and both went inside. Kanaras allegedly wanted to party, but the defendant said he was tired and wanted to go to bed. Kanaras then left and the defendant went to sleep.

"On 5/25/81 at about 9 a.m., Kanaras returned to Huffington's apartment and asked him to go partying. After showering, the defendant and Kanaras did some cocaine and drove around, heading toward the Fiddler's convention in Cecil County. . . .

"About 6:30 p.m. Kanaras called him asking him to cover for him, to tell anyone who asked, that they were at the Fiddler's Convention all night. The defendant claimed that at that time he did not know why Kanaras asked him to cover for him. . . .

"The defendant stated that he protected Kanaras with an alibi. He claimed that Kanaras never explained why he needed an alibi. The defendant denied participation in the crimes and denied his guilt to the charges. When asked if he had knowledge of or a hunch who committed the offense, the defendant said, 'I couldn't say.' He stated that he feels 'fed up' and has 'lost a lot of respect for the judicial system.' "

Relying upon *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), Huffington claims that the admission of his statement violates his rights under the Fifth Amendment to the United States Constitution as delineated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He makes no contention relative to Sixth Amendment rights. In *Estelle* the Court said, "We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned." 451 U.S. at 462–63, 101 S.Ct. at 1873, 60 L.Ed.2d at 369. The Court further said:

"'Volunteered statements . . . are not barred by the Fifth Amendment,' but under *Miranda v. Arizona, su-*

*pra,* we must conclude that, when faced while in custody with a court-ordered psychiatric inquiry, respondent's statements to Dr. Grigson were not 'given freely and voluntarily without any compelling influences' and, as such, could be used as the State did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them. *Id.,* at 478 [86 S.Ct. at 1630]. These safeguards of the Fifth Amendment privilege were not afforded respondent and, thus, his death sentence cannot stand.[13]

---

[13] Of course, we do not hold that the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a sentencing determination." 451 U.S. at 469, 101 S.Ct. at 1876, 60 L.Ed.2d at 373.

We simply do not find *Estelle* or Huffington's Fifth Amendment rights applicable to the statement in the case at bar. We have set forth Huffington's version of the evidence and the statement in question at some length in order that there may be no misunderstandings. It is true that Huffington in his statement indicated that he had been in the company of Kanaras and of the victims, Diane Becker and Joseph Hudson. However, according to the statement given by Huffington, at the time when the alleged crimes were being committed he was home by himself and asleep. We find no infringement of Huffington's rights against self-incrimination.

### iv. Victim participation

■ Code (1957, 1982 Repl.Vol.) Art. 27, § 413(g)(2) provides that a mitigating factor shall be that "[t]he victim was a participant in the defendant's conduct or consented to the act which caused the victim's death." Huffington contends that Hudson was a participant in the conduct leading to his death and hence Huffington was entitled as a matter of law to this mitigating factor.

Art. 27, § 413(g), enacted by Ch. 3 of the Acts of 1978, is modeled after § 210.6(4)(c) of the Model Penal Code. The latter states relevant to mitigating factors, "The victim was a participant in the defendant's homicidal conduct or con-

sented to the homicidal act." There are no relevant cases, annotations, or legislative references concerning either section which we have been able to find. Accordingly, the commentary note to the Model Code provision is of importance. II *Model Penal Code and Commentaries*, § 210.6 (1980) states:

> "Paragraph (c) addresses the case where the victim is partially responsible for his own death. This circumstance obtains chiefly in two kinds of situations. First, there are occasions in which the defendant and his victim are engaged jointly in an activity highly dangerous to each. If each person's participation depends upon the cooperation of the other, a murder conviction may lie for the death of one actor, even though both share responsibility. An example may be the case of Russian roulette, at least where the defendant actually fires the shot that kills his partner. A second situation within the scope of Paragraph (c) is the true mercy killing. There the defendant's homicidal act may not have occurred had the victim not consented to it. In either of these contexts, the conduct of the victim in bringing about his own death deserves consideration as a mitigating factor in assigning a death sentence." *Id.* at 140–41.

Huffington contends:

> "Hudson's activity falls within the first situation. Accompanying known drug dealers to a rural area in the middle of the night has much in common with 'Russian roulette'—the chance of becoming a victim of crime in that circumstance is probably better than one in six. Hudson's activity was illegal, foreseeably dangerous, and very much a part of *Appellant's* conduct. Absent the victim's participation in this illegal and dangerous activity, there would have been no murder. The mitigating factor should have been returned and considered." (Emphasis in original.)

Kanaras testified as to Hudson's death:

"Ah, I parked the car, and where the car was parked it wasn't too much room on each side of the road, it was like a slight embankment on one side and an embankment on the other side, so two people really couldn't fit together coming out of the car, so I got out of the driver's side of the car and Joe Hudson got out of the passenger side of the car, and we met at the—the back of the car, and John Huffington was right behind too, about three or four steps, and as we walked up to the house, that's when I heard these shots—four or five shots rang out, and I saw Joe Hudson fall—fall to the ground to his—on his side, and he rolled—he rolled over . . . ."

This was the evidence before the jury. It does not make Hudson out as a participant in Huffington's conduct which caused Hudson's death. According to the testimony Hudson and Huffington were joint participants and co-conspirators in an alleged drug sale. The conduct which caused Hudson's death related to Huffington's carrying and concealing a loaded pistol and the firing of such pistol at Hudson's back. It is beyond the stretch of anyone's imagination to say that Hudson participated in this conduct.

We have recently stated, "It is the accused's burden to prove, by a preponderance of the evidence, the existence of a mitigating circumstance. [Section] 413(g); *Tichnell v. State,* 287 Md. 695, 730, 415 A.2d 830, 848–49 (1980)." *Stebbing v. State,* 299 Md. 331, 361, 473 A.2d 903, 918 (1984). In the case at bar Huffington failed to carry his burden concerning proof of the mitigating factor that Hudson participated in the acts causing his death. Moreover, the issue was not presented to the trial court. Hence, it is deemed waived. Rule 885.

v. Arbitrariness in seeking the death penalty

At one point in the proceedings Huffington proffered a guilty plea in exchange for a life sentence. Huffington asserts that defense counsel was "under the impression that the State had conditionally accepted the offer," but then rejected it when the parents of Becker found it unac-

ceptable. Huffington moved to strike the notice of intention to seek the death penalty, contending consideration of the wishes of the family made this an arbitrary factor. He relies upon *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

The State responds that it "had already made [the] decision [to seek the death penalty], given notice to [Huffington], and proceeded to trial prior to the alleged 'arbitrary' action." It contends that the feelings of victims' families are legitimate considerations and that in any case it is not bound to accept a proposed plea agreement. It further asserts:

"In this case the Court at sentencing invoked a novel procedure when it allowed the defense to place plea negotiations before the sentencing jury and argue that the State's consideration thereof should be a mitigating factor. In other words, the jury was allowed to determine whether the State's response to the defense's offer was some indication that the death penalty was not appropriate in this case. The State protested such action below and it is the State's position here on appeal that this procedure gave Appellant more than he was entitled to."

In *Calhoun v. State,* 297 Md. 563, 468 A.2d 45 (1983), the accused mounted an attack upon our death sentence statute based upon what he called the prosecutor's "unbridled exercise of discretion" under Art. 27, § 412(b). We considered *Gregg* and *Furman* and concluded:

"Absent any specific evidence of indiscretion by prosecutors resulting in an irrational, inconsistent, or discriminatory application of the death penalty statute, Calhoun's claim cannot stand. To the extent that there is a difference in the practice of the various State's attorneys around the State, our proportionality review would be intended to assure that the death penalty is not imposed in a disproportionate manner." 297 Md. at 605, 468 A.2d at 64.

We do not regard consultation with the family of the victim here, after the State had already made a decision to seek the death penalty and after trial had begun, as any evidence of indiscretion by a prosecutor. We hold this contention to be without merit.

### vi. The indictment

■ At Huffington's first trial a special verdict form was used. The jury convicted him of two felony murders and specifically acquitted him on charges that the two murders were premeditated. *Huffington v. State*, 302 Md. 184, 186, 486 A.2d 200, 201 (1985). The conviction was reversed on appeal. As Huffington puts it, "The State elected to try the second case on the same indictment, which appears to have been modified to reflect the exclusion of premeditated murder from the case." The charge of murder of Hudson reads as follows:

> "The Jurors of the State of Maryland, for the body of Harford County, do on their oath present that JOHN NORMAN HUFFINGTON, late of said County, on or about the 25th day of May, 1981, in the County aforesaid, unlawfully, willfully and of deliberately premediated [sic] malice aforethought did kill and murder Joseph Mallison Hudson, Jr., contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State." "(Murder, First Degree, Art. 27, §§ 407, 410, 412, 413, 616)".

Except for not striking out the inapplicable sections of the Code, the count in the indictment pertaining to the death of Diane Becker is identical, including the misspelling of "premeditated."

Huffington challenges his indictment on the ground that "[t]he charging documents ... listed the elements for premeditated murder, but not felony-murder." He objects on jurisdictional grounds and constitutional grounds. In the trial court no pretrial motion was made pertaining to the adequacy of the indictment. There was a motion to dismiss on double jeopardy grounds, an issue which we considered

and rejected in *Huffington v. State*, 302 Md. 184, 486 A.2d 200 (1985).

In *Williams v. State*, 302 Md. 787, 490 A.2d 1277 (1985), Chief Judge Murphy recently said for the Court:

"Under Maryland Rule 4–252(a) (formerly Rule 736a), a motion alleging a 'defect' in the charging document 'other than its failure to show jurisdiction in the court or its failure to charge an offense' must be filed within a designated time period prior to trial or the defect is waived.[2] The rule provides in subsection (c) that a motion 'asserting failure of the charging document to show jurisdiction in the court or to charge an offense may be raised and determined at any time.' A claim that a charging document fails to charge or characterize an offense is jurisdictional and may be raised, as here, for the first time on appeal. *See Putnam* [*v. State*, 234 Md. 537, 200 A.2d 59 (1964)]; *Baker* [*v. State*, 6 Md.App. 148, 250 A.2d 677 (1969)]; Maryland Rule 885. Where the claimed defect is not jurisdictional, it must be seasonably raised before the trial court or it is waived.

---

"[2] For good cause shown, the rule permits the trial court to order otherwise." 302 Md. at 792, 490 A.2d at 1279–80.

To like effect see *Hall v. State*, 302 Md. 806, 809, 490 A.2d 1287, 1288 (1985). It follows, therefore, that any constitutional claim is waived because there was not a motion filed within the time limited by the rule.

 The indictment was in the statutory form. Judge Cole recently said for the Court in *Robinson v. State*, 298 Md. 193, 202, 468 A.2d 328, 333 (1983), "[A]t least as a matter of state non-constitutional law, the legislatively enacted short-form indictment is presumed to be sufficient to charge the offense named in the statute," referring to felony-murder. Hence, Huffington cannot prevail on this issue.

vii. The constitutional issues

Huffington recognizes, as indeed he must, that we have heretofore found the Maryland Capital Punishment Statute·

to be consistent with the requirements of the Constitution of the United States. However, he draws upon the dissent by Justice Marshall, joined by Justice Brennan, to the denial of certiorari by the Supreme Court in *Stebbing v. Maryland,* —— U.S. ——, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984), and suggests that "serious flaws exist in Maryland's statutory scheme." He asserts that "in at least two respects—manditoriness and a defendant's burdens—the Maryland procedure is substantially different from procedures found constitutional by the Supreme Court." Hence, he "urges reconsideration of these issues under Amendments Eight and Fourteen of the United States Constitution and Article 25 of the Maryland Declaration of Rights."

Cases in which we have considered and rejected constitutional attacks similar to that here raised include *Foster v. State,* 304 Md. 439, 471, 499 A.2d 1236, 1252 (1985); *Evans,* 304 Md. at 536, 499 A.2d at 1286; *Colvin v. State,* 299 Md. 88, 122–27, 472 A.2d 953, 970–72 (1984); *Calhoun v. State,* 297 Md. 563, 635–38, 468 A.2d 45, 80–81 (1983), and *Tichnell,* 287 Md. at 720–34, 415 A.2d at 843–50. We deem the matter to be settled.

### viii. Multiple murders

Huffington contends that the State improperly used the death of more than one person as an aggravating factor while at the same time seeking two death sentences.

Code (1957, 1982 Repl.Vol.) Art. 27, § 413(d)(9) lists that "[t]he defendant committed more than one offense of murder in the first degree arising out of the same incident" as an aggravating circumstance which may be considered by the sentencing authority. Separate findings and sentencing determination forms were submitted to the jury pertaining to the death of each of the victims. In each instance the jury found that the defendant committed more than one offense of murder in the first degree arising out of the same incident. In each instance the jury also found as an aggravating factor that Huffington committed the murder while committing or attempting to commit robbery, arson,

or rape or sexual offense in the first degree, a factor spelled out in Art. 27, § 413(d)(10).

Huffington argues:

"Obviously, the legislature intended that only one death sentence be returned in a case where more than one person was killed: Imposition of a second death sentence is redundant, and is inconsistent with the purpose of making the additional murder(s) an aggravating factor. Such double punishment is improper."

In the recent case of *Thomas v. State*, 301 Md. 294, 483 A.2d 6 (1984), the defendant was convicted of murdering a husband and wife in the same incident. The State sought two death sentences. The trial judge, as the sentencing authority, found with respect to both homicides the aggravating factor authorized by § 413(d)(9), namely that Thomas committed more than one offense of murder in the first degree arising out of the same incident. We said, "We find no error in the trial court's application of § 413." *Thomas* is dispositive of this contention.

### ix. Proportionality review

Code (1957, 1982 Repl.Vol.) Art. 27, § 414(e) provides:

"(e) *Considerations by Court of Appeals.*—In addition to the consideration of any errors properly before the Court on appeal, the Court of Appeals shall consider the imposition of the death sentence. With regard to the sentence, the Court shall determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

"(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413 (d);

"(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances are not outweighed by mitigating circumstances; and

"(4) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

 We do not find the death sentence here to have been imposed under the influence of passion, prejudice or any other arbitrary factor. We find that the evidence supports the jury's finding of statutory aggravating circumstances under § 413(d). We further find that the evidence supports the jury's finding that the aggravating circumstances are not outweighed by mitigating circumstances.

We turn to the proportionality review to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

In *Thomas v. State,* 301 Md. 294, 483 A.2d 6 (1984), Chief Judge Murphy said for the Court:

"The principles governing proportionality review of a death sentence in Maryland have been stated in a number of our cases. *Stebbing v. State,* 299 Md. 331, 473 A.2d 903 (1984); *Colvin v. State,* 299 Md. 88, 472 A.2d 953 (1984); *Calhoun v. State,* 297 Md. 563, 468 A.2d 45 (1983); *Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983). The fundamental object of the statutorily mandated appellate review process is the avoidance of the arbitrary or capricious imposition of the death penalty by affording similar treatment to similar capital cases. *Tichnell,* 297 Md. at 466, 468 A.2d 1. The focus of § 414(e)(4) is upon capital cases in which the sentencing authority determined to impose a life or death sentence; the subsection aims to assure that upon consideration of both the crime and the defendant the aggravating and mitigating circumstances present in one capital case will lead to a result similar to that reached under similar circumstances in another capital case, thus identifying the aberrant sentence and avoiding its ultimate imposition. *Id.* 297 Md. at 465, 468 A.2d 1. Our procedure is to review all reports filed by trial judges in capital sentencing cases, as re-

quired by Maryland Rule 772A, and to select those which we deem 'similar' within the contemplation of the statute." .301 Md. at 334–35, 483 A.2d at 27.

Huffington is now 23 years of age and was about two and a half months short of 19 years of age at the time of the incident in question. As we have indicated, in each of the two homicides the jury found the aggravating factors that the defendant committed more than one offense of murder in the first degree arising out of the same incident and that he committed each murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree. Mitigating circumstances found by a preponderance of the evidence were the youthful age of the defendant at the time of the crime and that he had not previously been found guilty of a crime of violence, entered a plea of guilty or nolo contendere to a charge of a crime of violence, or had a judgment of probation on stay of entry of judgment entered on a charge of a crime of violence.

The evidence shows that Huffington murdered. Joe Hudson by shooting him five times in the back and head and that he then stole drugs from Hudson's person. It further shows that Huffington then went to Hudson's mobile home and there murdered Diane Becker by striking her with a bottle and then stabbing her thirty-three times. He took money and drugs from the home before fleeing.

■ In *Tichnell v. State*, 297 Md. 432, 469, 468 A.2d 1, 20 (1983), we set forth the "relevant universe" to be considered by us in our proportionality review. In the process of our review in this case we have considered each of the reports submitted by trial judges under Maryland Rule 4–343. We have selected eight which we deem to be "similar" within the contemplation of Art. 27, § 414(e)(4).

*Lawrence Johnson.* Johnson was 17 years and 10 months old at the time of the commission of his crimes. According to the report of the trial judge he and his cousin entered a dwelling house through a basement window. Once inside they went up the basement steps to the first

floor where they discovered the presence of the victim, who was 78 years old, small in stature, weighed but ninety pounds and was home alone. When their demands for money were not satisfied they grabbed her and shoved her into a spare bedroom. In the course of this episode the victim was brutally beaten with a broom handle, stomped on and kicked, tied, and strangled to death.

The jury found as an aggravating circumstance that the murder was committed while committing or attempting to commit robbery, arson or rape or sexual offense in the first degree. Mitigating circumstances found were that the defendant was not the sole proximate cause of the victim's death and, under "[o]ther mitigating circumstances," the life sentence of the co-defendant. The jury sentenced to death.

*Donald Thomas.* Thomas was 23 years old when he committed the acts which brought him to the bar of justice. The trial judge in his report summarized the facts:

"Somehow on the night of October 1–2, 1981, the Defendant and the deceased, Donald Spurling, were in joint company with each other. This association appeared friendly. After visiting at least one person, and a bar, they subsequently ended up at the Spurling residence in Baltimore County. For some motivation unbeknownst to the Court, the Defendant killed, with multiple stab wounds, Donald Spurling. Mrs. Spurling, who was apparently awakened by some noise, was subsequently stabbed to death by multiple wounds by the Defendant and sexually molested by the Defendant either during or after her life [sic]. The Defendant then went to the second floor and raped a young woman in her bed, who was a boarder of the Spurling residence. She ultimately escaped by jumping out of the second story window."

The trial judge found as the sole aggravating circumstance that Thomas had committed more than one murder. No statutory mitigating circumstances were found to exist. The judge did find under "[o]ther mitigating circumstances"

"demographic characteristics and background of defendant." The trial judge, as the sentencing authority, concluded that the aggravating circumstances outweighed the mitigating circumstances and imposed the death penalty.

*Willie Green.* Green was 40 years of age when he and an accomplice murdered two employees of a restaurant in the course of a robbery. The victims were both stabbed to death. One victim had his hands tied behind him and his throat was slit. Two aggravating circumstances were found to exist, that Green committed more than one murder in the first degree arising out of the same incident and that the murders were committed during the commission of a robbery. Mitigating circumstances found were that the defendant was not the sole proximate cause of the deaths of the victims and that it was unlikely in view of his age that he would engage in further criminal activity. The trial judge was the sentencing authority. He found by a preponderance of the evidence that the mitigating factors outweighed the aggravating factors. Accordingly, life sentences were imposed.

*Eugene Sherman Colvin.* Colvin broke into a house. In the course of the crime he encountered the victim who was visiting in the home of her daughter. The victim was stabbed twenty-eight times about the throat. The weapon used was an eight-inch serrated knife taken from the kitchen of the home. About $10,000 in jewelry was removed from the residence. The victim's money was taken. Colvin was found guilty of premeditated murder, felony murder, robbery with a deadly weapon, and housebreaking.

As an aggravating circumstance the jury found that the murder was committed while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree. No mitigating circumstances were found. Colvin had been convicted several times of burglary, assault, and larceny. The jury imposed the death sentence.

*James Arthur Calhoun.* Calhoun was 28 years of age when he became involved in an incident leading to his

conviction of premeditated first degree murder of a Montgomery County police officer who had responded to a security alarm at a mercantile establishment. The officer, in company with the assistant manager of the store and a representative of the burglar alarm system for the store, entered a room inside the store where Calhoun and an accomplice had concealed themselves. Calhoun pressed a gun against the officer's head and shot him to death. Calhoun's accomplice, Curtis Monroe, shot and killed the alarm system representative and wounded the assistant manager. Calhoun and Monroe took money from the store and fled. The jury found as aggravating factors: (1) The victim was a law enforcement officer who was murdered in the performance of his duties; (2) the defendant committed the murder in furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest or detention of or by an officer or guard of a correctional institution or by a law enforcement officer, and (3) the defendant committed the murder while committing or attempting to commit robbery. The only mitigating circumstance found was set forth under "[o]ther mitigating circumstances." The jury stated:

"This jury feels that a substantial mitigating factor is the defendant's background, which has been such that he has never been integrated into society. Therefore, he has been and is unable to conform with its norms and moral values."

The jury imposed a death sentence.

*Curtis Wayne Monroe.* Monroe is the same Monroe mentioned relative to James Arthur Calhoun. The incident is also the same. The report of the trial judge relative to the facts, states:

"The police officer was pulled into a room, subdued, and shot in the head by Calhoun. At the same time, Monroe began firing a handgun, wounding the assistant manager, Douglas Cummins, and firing two shots into the alarm technician, David Myers, resulting in the death of Mr. Myers."

Monroe waived a jury and elected to have the sentencing procedure before the trial judge. As an aggravating circumstance it was found beyond a reasonable doubt that Monroe "committed the murder while committing or attempting to commit robbery, arson or rape or sexual offense in the first degree." The trial judge noted two mitigating circumstances. First, he found that it was unlikely the defendant would engage in further criminal activity that would constitute a continuing threat to society. Second, under "[o]ther mitigating circumstances," he found:

"Defendant has been employed, has a wife and two children.

"The actions of the defendant causing the murder, along with his background when compared to the other first degree murder cases occurring since the enactment of Article 27, Section 413, in which the death penalty has not been imposed.

"Efforts by the defendant since his incarceration to further his education."

Life imprisonment was imposed. In his report to us the trial judge said:

"The primary consideration in not imposing the death penalty was the Court's own proportionality test in comparison to other offenses in the Circuit Court for Montgomery County in which the death penalty had been sought but not imposed, and a comparison between Curtis Wayne Monroe and the co-defendant James Arthur Calhoun, who received the death penalty, indicated that the imposition of the death penalty was not appropriate in this case. Other mitigating circumstances did not outweigh the aggravating factor and the nature of the offense."

*Jackie Hughes.* While a manager of a restaurant was walking to a nearby bank to deposit weekend receipts, Hughes approached him from behind, grabbed him, spun him around, and shot him in the stomach. After a brief struggle Hughes wrested away the deposit. The victim,

who was licensed to carry a handgun, fired several shots at Hughes at close range. A jury found Hughes guilty of first degree murder on the basis of the fact that it was a deliberate, willful and premeditated murder as well as a felony murder.

The jury found as an aggravating factor that the murder was committed while committing or attempting to commit a robbery. As a mitigating factor it found that Hughes had not previously been convicted of a crime of violence, etc. It also checked on the sentencing form that other mitigating circumstances existed. However, it listed no such circumstances. The jury returned a sentence of life imprisonment.

*Brian Keith Quickley.* Quickley and two others entered a furniture store in Harford County. An accomplice lured the victim to an area of the store isolated from the cash register. Quickley there shot the victim once between the eyes and again, as he was falling, in the back of the neck. The three individuals then left the store, taking television sets with them.

The jury found one aggravating circumstance, that the defendant committed the murder while committing or attempting to commit a robbery. It found two mitigating circumstances. The first was the youthful age of the defendant at the time of the crime. The second, under "[o]ther mitigating circumstances," was:

> "The defendant is at the borderline range of intelligence with severe intellectual limitations both at the verbal and performance measured levels. His overall Intelligence Quotient was scored at 71. He is the product of an impoverished, social and educational environment. His academic progress has been limited. He has been in and out of Special Education and last attended the ninth grade. Extensive materials (tests, reports, etc.) from Juvenile Services, Harford County Public School System, the Maryland Children's Center and various social service

groups have been filed in these proceedings as exhibits that demonstrate these inabilities."

The jury sentenced him to life imprisonment.

We find the sentences not disproportionate to those imposed in similar cases. It thus follows that the death sentences must be affirmed.

JUDGMENT AFFIRMED.

McAULIFFE, Judge, dissenting.

I cannot agree that the trial judge properly excluded a transcript of the testimony of Stephen Rassa. Rassa's testimony was critical to Huffington's defense, and Rassa could not be found. Huffington therefore offered a transcript of testimony given by Rassa as a State's witness in the prosecution of Deno Kanaras, but this evidence was rejected on the ground the State had no opportunity to cross-examine its own witness. The majority recognizes that direct-examination by the party against whom the testimony is offered may be sufficient to justify the admission of previous testimony, but affirms on the basis that the motives of the State at the time it offered the evidence differed significantly from those of Huffington when he offered it. A careful analysis of the facts will disclose, however, that Huffington and the State each wanted to develop precisely the same facts from Rassa, and that each did so for the purposes of impeaching Kanaras' credibility and discrediting his claim of duress. That the State's motive in the first case was to convict Kanaras by discrediting his testimony and its motive in the second case was to convict Huffington by relying on Kanaras' testimony is simply irrelevant. It is the identity of the motives of the two parties who offer the testimony that is material, and not the shifting motives of the State.

The general rule applicable in this situation is not in dispute. Professor Wigmore wrote:

[T]he whole notion of cross-examination refers to one's right to probe the statements of an opponent's witness,

not one's own witness; thus, if A has taken X's deposition or called X to the stand, and B has cross-examined, it is not for A to object that he has not had the benefit of cross-examination; that benefit was not intended for him nor needed by him; it was intended only to protect against an opponent's witness, who would be otherwise unexamined by A; and if A has had the benefit of examining a witness called on his own behalf, he has had all that he needs, and the right to probe by cross-examination is B's, not A's.

5 Wigmore, *Evidence* § 1389 at 105 (3d ed. 1940).

And in a more recent text the authors pose and answer the question in this fashion:

Is the opportunity for direct and redirect examination the equivalent of the opportunity for cross-examination? If party A (or his predecessor in interest) calls and examines a witness in the first hearing, and this testimony is offered against A in a second trial, may it come in against the objection of want of opportunity to cross-examine? The decisions sensibly hold that it may.

*McCormick on Evidence* § 255 at 762 (E. Cleary 3d ed. 1984).

Fed.R.Evid. 804(b)(1) is to the same effect, and describes the circumstances under which the former testimony of an unavailable witness will not be excluded by operation of the hearsay rule:

Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

The pivotal question, then, is whether the State had a motive similar to that of Huffington to develop the testimony of Rassa. This in turn requires a consideration of the

issues intended to be addressed by the testimony in each case, and as indicated by the following advisory committee note to Fed.R.Evid. 804(b)(1) the question is whether there exists a "substantial" identity of issues.

The common law did not limit the admissibility of former testimony to that given in an earlier trial of the same case, although it did require identity of issues as a means of insuring that the former handling of the witness was the equivalent of what would not be done if the opportunity were presented. Modern decisions reduce the requirement to "substantial" identity. Since identity of issues is significant only in that it bears on motive and interest in developing fully the testimony of the witness, expressing the matter in the latter terms is preferable. (Citation omitted).

We look first at Huffington's motive in seeking to introduce the testimony of Rassa. It was clear from the State's evidence that only two persons in addition to the victim were present on the occasion of each murder—Kanaras and Huffington. Kanaras was therefore the State's principal witness against Huffington. Kanaras testified that he was with Huffington on the night of the murders, but that Huffington killed each victim. Kanaras denied any previous knowledge that Joseph Hudson or Diane Becker were going to be robbed or murdered, and he further asserted that while he had been forced by Huffington at gunpoint to provide some assistance he did not assist in any way in the actual killing of the victims.

Kanaras testified he had known Hudson and Huffington for some time, and had purchased drugs from both of them. On the night in question he and Huffington were attempting to purchase cocaine when they met Hudson and Becker (Hudson's girlfriend) at a bar. Arrangements were made to buy the drug from Hudson, and Kanaras drove Huffington to the trailer shared by Hudson and Becker. Kanaras said Hudson sold them 3.5 grams, which appeared to be about half the supply Hudson had on hand. He said he and Huffington then returned to Huffington's apartment where

they used some cocaine and Huffington apparently made calls in an attempt to broker the sale of Hudson's remaining cocaine. Acting on the belief that Huffington had found a buyer, and upon the promise that Huffington would give him some additional cocaine for providing transportation, Kanaras said he drove Huffington back to the Hudson trailer, where Hudson joined them. He then drove, at the direction of Huffington, to a rural area in Harford County and stopped near a farmhouse. According to Kanaras, he was walking alongside Hudson toward the farmhouse to meet the prospective purchaser when Huffington fired five shots into Hudson. Kanaras said that Huffington then reloaded the pistol, rolled the body of Hudson over, and fired two more shots into Hudson's head at point-blank range. Kanaras admitted that the weapon used had once been owned by him, but claimed he had sold it to Huffington about five weeks earlier.

Kanaras said Huffington then pointed the gun at him and ordered him to drive back to the trailer. Once inside the trailer Kanaras was directed to search for Hudson's money. Following a successful search, Kanaras said Huffington struck the sleeping Diane Becker several times with a heavy bottle, and then repeatedly stabbed her with a knife Huffington produced from his boot. Kanaras testified he was then forced to accept a large amount of the money that had been stolen from Hudson, and to assist Huffington in destroying or disposing of evidence and attempting to establish an alibi. Kanaras denied he had been to Hudson's trailer during the week preceding the murders, and denied having possessed a gun at that time.

Rassa's testimony dealt with the events of May 20, 1981, five days before the murders. Rassa testified he and Kanaras had driven to Hudson's trailer on that date, to buy cocaine. In response to direct questions by the State's Attorney, Rassa described the events immediately preceding entry into Hudson's trailer:

A. Well, there had been a lot of discussion on the way down Long Bar Harbor Road between Deno and myself,

and Deno had told me he was interested in going to Joe's trailer—Joe Hudson—to buy some cocaine.

\* \* \* \* \* \*

Deno became very quiet. He wasn't holding any conversation with me. Because I had had prior conversations with him about Joe Hudson and Diane Becker. I was nervous and I wasn't sure what was going to happen down that road and I wanted a chance to kind of find out what he was thinking about so that I might be able to talk him out of it....

\* \* \* \* \* \*

Q. [By State's Attorney] ... As a result of certain conversations you had with Deno in the car right before you got to Hudson's trailer on the 20th, tell us—right before you went into the trailer, tell us what you said to him and what he said to you?

A. Okay. As he was pulling his car to a stop outside of the motor home—excuse me—I want to be absolutely sure. I can remember that as the car was coming to a stop he turned towards me and he reached underneath of my seat, and I said, "What are you doing", and he said, "I'm getting my gun." And I said, "Leave it there. Don't get your gun. I don't want any parts of anything like this." And I looked both ways outside of the car because I didn't want to be seen. I wasn't really sure what was going to happen at that time....

\* \* \* \* \* \*

I said, "Come on, Deno, let's go in.", and he said, he reached under the seat again, and I said again, "What are you doing?", and he said, "I'm just getting my gun. I just want to show it to you," And I said, "Deno, I don't need to see your gun. I've seen it before. Just leave it there." At that time I said to Deno "Is there something you're not telling me? Do you owe Joe money?" And there was no reply. I looked at him and I said, "Do you actually think that you could actually rob and shoot somebody in the middle of a crowded trailer park like this

in daylight, and do you actually think you could shoot someone?" And there was no reply. Deno then—excuse me—I said to Deno—no, excuse me again—Deno said, "I have a knife in the glove compartment." And I said, "Are you crazy? Do you actually think you could stab someone with a knife?" He said, "No, but you could", referring to myself. And I told him "I didn't want any parts of any of this."

On cross-examination Rassa said that on several occasions prior to May 20th he and Kanaras had discussed the possibility of robbing Hudson, and that he, rather than Kanaras, had initiated further discussion of the subject on that day.

Huffington's motive in offering this testimony is clear. Rassa directly contradicted Kanaras' testimony that he had not been to the Hudson trailer on May 20th, that he had not had a gun on that date, and that he had not discussed robbing Hudson at that time. Furthermore, if the jury believed that Kanaras was contemplating a robbery of Hudson just five days before the robbery and murders occurred, and was discussing with Rassa the possible use of the very types of weapons actually thereafter used, the jury would most likely refuse to believe Kanaras' protestations of being an innocent pawn in the hands of Huffington. Rassa's evidence permitted a reasonable inference that Kanaras had been a principal actor in the robbery and murder, and such evidence may well have created a reasonable doubt in the minds of the jurors that Huffington was the actual killer.

Turning to the State's motive in offering the testimony of Rassa during the trial of Kanaras, it is apparent that it was substantially, if not precisely identical to Huffington's motive. Testimony given by Kanaras in his own behalf was the same as that later given by him against Huffington. *See Kanaras v. State,* 54 Md.App. 568, 570–72, 460 A.2d 61, *cert. denied,* 297 Md. 109 (1983). Kanaras' defense was that he did not knowingly aid or abet in the death of Hudson, and that any assistance rendered thereafter was under duress. Following Kanaras' testimony, the State

offered the testimony of four rebuttal witnesses. The proffered testimony of these witnesses was summarized by the Court of Special Appeals as follows:

It was proffered that Stephen Rassa would testify that on May 20, 1981, shortly before purchasing cocaine from Hudson and Becker, Kanaras supposedly had to be dissuaded from robbing Hudson and stealing his cocaine. It was further proffered that Dale Saunders, Jr. would testify that Huffington and Kanaras came to "shake him down for money" due on a drug debt. Maryland State Trooper Gary Aschenbach, according to the State's proffer, would testify that while working undercover in early 1981, Kanaras had purchased drugs for him, had on one occasion carried a gun in anticipation of a large drug deal, and had expressed interest in an illegal scheme to destroy a boat for money. The testimony of Thomas Wagner, according to the State, would show that Kanaras had shown him what was to be the murder weapon. *Kanaras v. State, supra,* 54 Md.App. at 589, 460 A.2d 61.

Expressing some uncertainty that all the evidence proffered by the State was properly offered as rebuttal, the trial judge allowed the State to reopen its case, and thus Rassa's testimony became a part of the State's case in chief.

The majority states that "the purport of Rassa's testimony was that a few days before the incident in question Kanaras was still involved with drugs" and that this evidence was offered in rebuttal to Kanaras' earlier testimony that he had been free from drugs for some time before the murders. From this the majority concludes that the very limited objective of the State in offering this testimony differed substantially from the broader scope later intended by Huffington, and that the State therefore had no reasonable opportunity or motive to fully develop the facts about which Huffington was later concerned. The majority's conclusion is not supported by the facts. Kanaras had at all times readily admitted his involvement as a buyer and user of drugs. He did deny, however, that he sold drugs. The Court of Special Appeals held that rebuttal evidence

would be proper to show that Kanaras had been involved as a seller, but this clearly was not the principal thrust of Rassa's testimony.[1] A fair reading of the entirety of Rassa's testimony discloses an intent on the part of the State to discredit Kanaras' testimony, and show him to have been a principal. The Court of Special Appeals summed up the intent of the State when it said:

> [A]n important facet of the State's case was to prove that the appellant was a voluntary participant in the crimes. As such, it was proper to show that Kanaras both needed and lusted for money, had participated in prior drug transactions, and may have specifically considered robbing Hudson. The additional State's evidence supplied a motive for the crimes and supplied evidence of advance preparation for the crimes. As such, it was admissible to show an independent intent and motive to commit the crimes.

*Kanaras v. State, supra,* 54 Md.App. at 595, 460 A.2d 61.

The importance of Rassa's testimony to assist the trier of fact in assessing the credibility of Kanaras is perhaps best illustrated by the argument of the State's Attorney in support of the State's motion to have Kanaras called as a court's witness.[2]

> The following reasons, I'm going to basically go through a skeleton sketch of what he would testify and and why we don't believe we can believe him. His first indication would be that the first time that he had heard this particular incident or that this came about that he was aware that anybody was going to rob Joseph Hudson and Diane Becker was that night that it actually occurred—first of all, a witness tes—has testified, a State's witness has testified in a prior trial that Kanaras had discussed with him and tried to get him to rob Hudson

---

1. Rassa did not testify to any sale of drugs by Kanaras, but he did say that he and Kanaras had on occasion jointly attempted to sell methamphetamine.

2. This motion was denied, and Kanaras was called as a State's witness.

sometime prior to this, and therefore we believe—it is the State's contention that we believe—what we believe is that Kanaras wanted to rob Hudson, didn't have the whatever to do it by himself, and continued looking for someone to help him with this robbery after that contact with that particular individual, and that he was successful in finding this other person in the person of the defendant before the Court. That's the State's theory of the case.

The previous sworn testimony of Rassa was necessary for the proper presentation of the defendant's case and substantial reasons existed to assume its reliability. The testimony was admissible under accepted rules of evidence in this State, and in any event admissible to afford the defendant due process of law. *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). I would reverse the conviction and remand for a new trial.

I am authorized to state that Judges ELDRIDGE and COLE concur in the views here expressed.